COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-05-359-CR

 

 

HOWARD MACK                                                                 APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

            FROM
THE 158TH DISTRICT COURT OF DENTON COUNTY

 

                                              ------------

 

                                             OPINION

 

                                              ------------

                                          I.  Introduction








Appellant Howard Mack appeals
from his conviction and life sentence for the murder of Sandra
Oshunkentan.  In five issues, appellant
contends that the trial court erred by refusing to give jury instructions that
he requested, that the evidence is legally insufficient to support the jury=s finding that he used a knife, that the evidence is legally and
factually insufficient to prove that he intentionally or knowingly caused
Sandra=s death, and that there is a fatal variance between the indictment and
proof as to the date of Sandra=s death.  We affirm.

II.  Background Facts

In the early morning hours of
July 25, 2004, Denton police found Sandra dead from multiple stab wounds.  Her body had been hidden in the closet of her
trailer, rolled in a comforter, and wrapped in trash bags.  Appellant, Sandra=s live-in boyfriend, was charged with and convicted of Sandra=s murder.  The jury assessed
appellant=s punishment
at life in prison.

III.  Sufficiency of the Evidence

We address appellant=s sufficiency of the evidence issues first.  See Owens v. State, 135 S.W.3d 302,
305 (Tex. App.CHouston
[14th Dist.] 2004, no pet.).  In his
third issue, appellant contends that the evidence is legally insufficient to
prove that the object he used to cause Sandra=s injuries was a knife.  In his
fourth issue, appellant contends that the evidence is both legally and
factually insufficient to prove that he intentionally or knowingly caused
Sandra=s death.  In his fifth issue,
appellant contends that there is a fatal variance between the indictment and
the proof at trial in that the indictment charges that appellant murdered
Sandra Aon or about the 24th day of July, 2004@ but the evidence shows that she could have been killed the day after.








A.  Standards of Review

1.  Legal Sufficiency

In reviewing
the legal sufficiency of the evidence to support a conviction, we view all the
evidence in the light most favorable to the verdict to determine whether any
rational trier of fact could have found the essential elements of the crime
beyond a reasonable doubt.  Jackson v.
Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Hampton v.
State, 165 S.W.3d 691, 693 (Tex. Crim. App. 2005).  The standard of review is the same for direct
and circumstantial evidence cases.  Burden
v. State, 55 S.W.3d 608, 613 (Tex. Crim. App. 2001); Kutzner v. State,
994 S.W.2d 180, 184 (Tex. Crim. App. 1999).








The sufficiency of the
evidence should be measured by the elements of the offense as defined by the
hypothetically correct jury charge for the case.  Malik v. State, 953 S.W.2d 234, 240
(Tex. Crim. App. 1997); Ortiz v. State, 993 S.W.2d 892, 895 (Tex. App.CFort Worth 1999, no pet.).  Such
a charge would be one that accurately sets out the law, is authorized by the
indictment, does not unnecessarily restrict the State=s theories of liability, and adequately describes the particular
offense for which the defendant was tried. 
Gollihar v. State, 46 S.W.3d 243, 253 (Tex. Crim. App. 2001); Malik,
953 S.W.2d at 240.  The law as
authorized by the indictment means the statutory elements of the charged
offense as modified by the charging instrument. 
See Curry v. State, 30 S.W.3d 394, 404 (Tex. Crim. App. 2000).

2. 
Factual Sufficiency








In reviewing the factual
sufficiency of the evidence to support a conviction, we are to view all the
evidence in a neutral light, favoring neither party.  See Zuniga v. State, 144 S.W.3d 477,
481 (Tex. Crim. App. 2004).  The only
question to be answered in a factual sufficiency review is whether, considering
the evidence in a neutral light, the fact finder was rationally justified in
finding guilt beyond a reasonable doubt. 
Id. at 484.  There are two
ways evidence may be factually insufficient: 
(1) when the evidence supporting the verdict or judgment, considered by
itself, is too weak to support the finding of guilt beyond a reasonable doubt;
or (2) when there is evidence both supporting and contradicting the verdict or
judgment and, weighing all of the evidence, the contrary evidence is so strong
that guilt cannot be proven beyond a reasonable doubt.  Id. at 484-85.  AThis standard acknowledges that evidence of guilt can >preponderate= in favor of
conviction but still be insufficient to prove the elements of the crime beyond
a reasonable doubt.@  Id. at 485.  In other words, evidence supporting a guilty
finding can outweigh the contrary proof but still be insufficient to prove the
elements of an offense beyond a reasonable doubt.  Id. 
      In performing a factual
sufficiency review, we are to give deference to the fact finder=s determinations, including determinations involving the credibility
and demeanor of witnesses.  Id. at
481; Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  We may not substitute our judgment for the
fact finder=s.  Zuniga, 144 S.W.3d at 482.  

A proper factual sufficiency
review requires an examination of all the evidence.  Id. at 484, 486-87.  An opinion addressing factual sufficiency
must include a discussion of the most important and relevant evidence that
supports the appellant=s complaint
on appeal.  Sims v. State, 99
S.W.3d 600, 603 (Tex. Crim. App. 2003).

B.  Use of Knife

The officers who searched
Sandra=s trailer after finding her body found a butcher block in the kitchen
with three unfilled slots.  They found
two knives in the dishwasher:  a large
butcher knife and a small steak knife. 
Detective Bryan Lee testified that it appeared that the dishwasher had
been run recently because there was condensation and wet spots on the glasses
in the top rack.  The knives in the
dishwasher were clean, but the butcher knife later tested weakly positive for
blood.  The DNA analyst could not
determine, however, what type of blood or whose blood it was. 








The officers never found a
knife corresponding to the third unfilled slot in the butcher block.  They did find a lock-blade knife in Sandra=s SUV, which appellant had been driving after her death.[1]  That knife was clean but also tested weakly
positive for blood.  However, as with the
butcher knife, the DNA analyst could not tell what type of blood or whose blood
it was. 

Dr. Gary Sisler, a deputy
medical examiner for Tarrant, Parker, and Denton Counties, testified that he
performed an autopsy on Sandra on July 26, 2004.  Dr. Sisler found seventeen wounds on Sandra,
which he categorized as either stab wounds or cut wounds.  He described the stab wounds as being deeper
than the surface dimension, i.e., deeper than long, and the cut wounds as being
longer than deep. 

The first wound Dr. Sisler
found was a stab wound into the abdominal cavity.  That wound was two inches deep, measured one
inch across, and had smooth margins and a pointed end.  It went through the abdominal wall and muscle
and the diaphragm, and it lacerated the liver. 
Dr. Sisler testified that this wound could have been fatal by
itself.  According to Dr. Sisler, this
wound was consistent with a knife wound because it had a sharp end and a sharp
margin.  Dr. Sisler testified that a
knife has a pointed end and a sharp edge. 









Dr. Sisler testified that the
second wound was an elliptical stab wound made by a triangular instrument with
a blunt edge and sharp end.  It lacerated
the left upper pulmonary lobe.  According
to Dr. Sisler, most knives have a blunt edge opposite to the cutting edge,
which was consistent with this type of wound. 
The State asked Dr. Sisler if the butcher knife recovered from the
dishwasher could have caused such a wound, and he said it could have. 

The third and fourth wounds
were stab wounds that cut the soft tissue of the chest wall and lacerated the
left upper pulmonary lobe.  Dr. Sisler
testified that the fourth wound alone could have been fatal.  The fifth wound was a cut wound.  The sixth wound was a stab wound three inches
deep, which partially transected the carotid artery.  According to Dr. Sisler, if the carotid
artery is severed, a person has less than five minutes to live.  Dr. Sisler characterized the seventh wound as
a fatal stab wound.  It Acut a major muscle of the neck and also another partial transection of
the carotid artery.@ 








Sandra also had a cut wound
under her neck, a stab wound below her ear, a cut wound just above her right
ear and another just below her right ear, one cut wound on top of her right
shoulder and another on her right back shoulder, a three inch stab wound to her
trapezius against the fifth cervical vertebral,[2]
another stab wound into her cervical vertebral, a one-and-one-half-inch stab
wound that lacerated muscle, and another one-and-one-half-inch stab wound that
cut into her neck muscle.  Sandra also
had superficial cut wounds and bruises on her hands, which Dr. Sisler
characterized as defensive wounds. 
According to Dr. Sisler, defensive wounds generally occur when a person
tries to shield his or her face during an assault. 

Dr. Sisler further testified
that to a reasonable degree of medical certainty, Sandra=s wounds were caused by a knife. 
He also testified that the wounds could not have been caused by a
screwdriver[3]
because a screwdriver Amakes a
single slit and usually you=ll have scraped off ends.  We
call them abrasions over the upper and lower margin.@ 








We hold that the evidence is
legally sufficient to prove that appellant used a knife to stab Sandra.  Although Dr. Sisler agreed on
cross-examination that when the State asked him questions about the nature of
the weapon being from a particular type and he was given an exhibit, Athat would [have been] speculation,@ his testimony was very clear about the nature of the wounds and the
type of instrument that would have caused them. 
Therefore, we overrule appellant=s third issue.

C. Mens Rea

According to
appellant, the State failed to prove that appellant intentionally or knowingly
caused Sandra=s death.

Penal code section 6.03
defines the intentional and knowing mental states as follows:

(a) A person acts intentionally, or with intent,
with respect to the nature of his conduct or to a result of his conduct when it
is his conscious objective or desire to engage in the conduct or cause the
result.

 

(b) A person acts knowingly, or with knowledge,
with respect to the nature of his conduct or to circumstances surrounding his
conduct when he is aware of the nature of his conduct or that the circumstances
exist.  A person acts knowingly, or with
knowledge, with respect to a result of his conduct when he is aware that his
conduct is reasonably certain to cause the result.

 








Tex. Penal Code Ann. ' 6.03(a),(b)
(Vernon 2003).  Intent can be inferred
from the acts, words, and conduct of the accused.  Patrick v. State, 906 S.W.2d 481, 487
(Tex. Crim. App. 1995), cert. denied, 517 U.S. 1106 (1996).  It can also be inferred from the means used
and the wounds inflicted.  Womble v.
State, 618 S.W.2d 59, 64 (Tex. Crim. App. [Panel Op.] 1981); Yanez v.
State, 199 S.W.3d 293, 311 (Tex. App.CCorpus Christi 2006, no pet.). 
Intent may also be inferred from acts indicating a consciousness of
guilt.  See Claxton v. State, 124
S.W.3d 761, 766 (Tex. App.CHouston [1st Dist.] 2003, pet. ref=d); cf. Montgomery v. State, 810 S.W.3d 372, 396 (Tex. Crim.
App. 1990) (op. on reh=g) (noting
that the appellant=s intent to
arouse and gratify his own desire could be inferred by his consciousness of
wrongdoing, as evidenced by his telling children not to reveal to anyone what
had happened).








The evidence showed that
appellant and Sandra had argued heatedly in the past and before her death, that
appellant had behaved angrily and violently with Sandra at least twice before
her death, that he was possessive of her, 
and that she was afraid of him. 
Appellant inflicted eleven stab wounds and six cut wounds on the front
and back of Sandra=s body.  At least four of the stab wounds were
potentially fatal by themselves.  In
addition, it can be reasonably inferred that appellant showed a consciousness
of guilt by telling his friend Tracy Love that he had stabbed Sandra but not to
tell anyone what he had done, by washing the knives in the dishwasher, by attempting
to conceal evidence of the stabbing,[4]and
by lying to the police about his and Sandra=s whereabouts on the night of the murder.  We hold that the evidence is both legally and
factually sufficient to support the jury=s finding that appellant acted either intentionally or knowingly.

Having determined that the
evidence is both legally and factually sufficient to prove that appellant
caused Sandra=s death and
that he did so intentionally, we overrule appellant=s fourth issue.

D.  Date of Death

The indictment charged that
appellant stabbed Sandra Aon or about
the 24th day of July, 2004.@  At the close of the State=s evidence, appellant moved for a directed verdict on the following
grounds:  according to the medical
examiner investigator=s testimony,
Sandra=s death could have occurred anywhere from twelve to twenty-four hours
before the investigator examined her at the scene; therefore, A[t]hat period of time could have exceeded and gone past midnight on
July the 24th and been into July 25th, and the date was not narrowed to being a
period anterior to the date alleged in the indictment or the date on the
indictment.@ 








Troy Taylor, an investigator
for the medical examiner=s office,
testified that one of his jobs is to estimate time of death.  He examined Sandra=s body at her trailer at approximately 9:45 a.m. on Sunday, July 25,
2004, the day police found her body. 
Taylor estimated the time of death as approximately eighteen to
twenty-four hours before his examination. 
However, he later testified that Sandra could have died between twelve
and twenty-four hours before he examined her. 
A reasonable inference from this testimony is that Sandra=s death occurred anywhere from 9:45 a.m. on Saturday, July 24 (because
the police discovered Sandra=s body around 2 a.m. on July 25) to 9:45 p.m. on the 24th.[5]  In addition, Taylor also testified that
Sandra could have died as early as 9:16 a.m. on Saturday.[6]


Because Taylor=s testimony about time of death is consistent with the date of death
alleged in the indictment, we hold that there is no fatal variance between the
indictment and proof at trial as to the date of Sandra=s death.  See Gollihar,
46 S.W.3d at 246.  We overrule appellant=s fifth issue.








IV.  Manslaughter and Sudden
Passion Instructions

In his first
issue, appellant contends that Athe trial court erred by refusing the jury instruction for . . . the
lesser included offense of second degree murder.@  However, he also complains in
the same issue about the trial court=s failure to include a manslaughter instruction in the charge.  Because appellant properly asked for and was
denied both instructions, and because it appears that he is challenging the
denial of both in his first issue, we will review both complaints.

A.  Manslaughter

1.  Applicable Law








We use a two-pronged test to determine whether a defendant is entitled
to an instruction on a lesser-included offense. 
Rousseau v. State, 855 S.W.2d 666, 672-73 (Tex. Crim. App.), cert.
denied, 510 U.S. 919 (1993); Royster v. State, 622 S.W.2d 442, 446
(Tex. Crim. App. [Panel Op.] 1981) (op. on reh=g).  First, the lesser-included
offense must be included within the proof necessary to establish the offense
charged.  Salinas v. State, 163
S.W.3d 734, 741 (Tex. Crim. App. 2005);  Rousseau,
855 S.W.2d at 672-73; Royster, 622 S.W.2d at 446.  Second, some evidence must exist in the
record that would permit a jury to rationally find that if appellant is guilty,
he is guilty only of the lesser offense. 
Salinas, 163 S.W.3d at 741; Rousseau, 855 S.W.2d at
672-73; Royster, 622 S.W.2d at 446.

Appellant was charged with
murder under section 19.02(b)(1) of the penal code, which provides that A[a] person commits an offense if he . . . intentionally
or knowingly causes the death of an individual.@  Tex. Penal Code Ann. ' 19.02(b)(1) (Vernon 2003). 
Appellant asked that the jury be given an instruction on manslaughter
under section 19.04 of the penal code, which provides that A[a] person commits an offense if he recklessly causes the death of an
individual.@  Id. ' 19.04(a).  A person acts
recklessly when he is aware of but consciously disregards a substantial and
unjustifiable risk that the circumstances exist or the result will occur.  Id. ' 6.03.   

Manslaughter is a
lesser-included offense of murder.  Cardenas
v. State, 30 S.W.3d 384, 392-93 (Tex. Crim. App. 2000); Montgomery v.
State, 198 S.W.3d 67, 91 (Tex. App.CFort Worth 2006, pet. filed). 
Thus, the first prong of the Rousseau test has been met, and we
must decide whether the record contains some evidence that would permit a jury
to rationally find that appellant is guilty only of the lesser-included offense
of manslaughter.  Rousseau, 855
S.W.2d at 672-73; Montgomery, 198 S.W.3d at 91.








2.  Applicable Facts

Appellant
points to evidence that he and Sandra were arguing before she died, that they
had argued violently in the past, and that Sandra picked up the knife first as
entitling him to a manslaughter instruction. 
Courtney Durham, Sandra=s friend, testified that Sandra and appellant=s relationship changed after they started dating, and Sandra became
stressed out, frustrated, and unhappy. 
Appellant started hanging around Sandra more and either did not want her
to go out with her girlfriends or went out with them.  Sandra became tearful at work and wanted to
end her relationship with appellant. 
Once when she tried to move appellant out of the trailer with Courtney=s help, appellant came through the door angrily, took Sandra into the
bedroom with him, and locked the door. 
She was screaming and afraid. 
Another time, in May 2004, Sandra locked appellant out of the trailer,
and he kicked in the door until it burst open. 
Durham called 911, and when the police arrived, appellant agreed to
leave.  








Appellant=s friend, Tracy Love, testified that on Saturday, July 24, 2004, the
day of Sandra=s death,
appellant showed up in Norman, Oklahoma, where Tracy was visiting his
girlfriend, around 10:45 or 10:50 p.m. 
Appellant called Tracy=s cell phone and asked to meet. 
They met at a gas station.  Tracy
asked appellant where Sandra was. 
Appellant first said that he did not know where Sandra was, but he then
told Tracy that Ahe [had]
stabbed her and put her in the closet.@  When Tracy asked appellant why
he had done that, appellant said, A[I] don=t know.@  Appellant was crying and
emotional and said that he wanted to kill himself.  He appeared to be in a state of shock.  Appellant told Tracy that Sandra=s last words were that she loved appellant.  Tracy testified on cross-examination that
appellant had called him earlier that day and said Sandra was Atripping@ about
appellant going to Whitesboro to see his daughter. 

Detective Shane Kizer with
the Denton Police Department interviewed appellant after the police found Sandra=s body.  He took appellant to
the police station where appellant gave a statement detailing his activities on
the day Sandra was killed (which, if believed, would have precluded any
involvement in her death).  After
appellant gave his statement, Detective Kizer told appellant that what he
believed really happened

was
that for some reason that he and Sandra had gotten into an
argument, . . . . 
[D]uring the course of the argument . . . that he got enraged, lost
control, did something that caused Sandra=s death, then he went into
kind of shock, decided to try and cover it up. 
A little bit later, he came to his senses, realized what he was doing
was wrong . . . . 
[Emphasis added.] 

 








 Detective
Kizer testified that while he was saying this to appellant, appellant Awas very intent on what I was saying, and the whole time, he was - -
as he was listening, he was nodding his head as if to be saying yes.@  Detective Kizer then asked
appellant if that was what happened.  At
that point, appellant invoked his right to counsel. 

Staci Irvin, one of appellant=s former girlfriends, testified that after Sandra=s death, she went to see appellant in jail several times because she
wanted to know Awhy it
happened.@  Appellant told Staci that Sandra had pulled a
knife and dropped it, then he picked it up. 
He also said that Sandra had Adied fast.@  When Staci asked appellant why he did not
just walk away because he was bigger, he said, A[Y]ou don=t know what
you would do in that situation.@  Staci knew that appellant and Sandra
argued a lot and that Sandra would Aput him out@ of the
house, then let him move back in. 

Sandra=s brother, Cody Housden, testified that appellant and Sandra argued a
lot and that their arguments were very heated. 
He also testified that a couple of weeks after Sandra died, appellant
called Cody and Sandra=s mother=s house from jail.  The call was
recorded, and the State introduced the recording into evidence at trial.  Appellant relies heavily on the statements he
made in this recorded call as entitling him to instructions on manslaughter and
sudden passion.[7]








Sandra=s mother answered the phone. 
Appellant told her that on Saturday, July 24, 2004, the day of the
murder, he and Sandra watched a movie, went to the store, and then went back to
Sandra=s trailer.  They lay down, and
he peeled Sandra=s back where
it had been sunburned.  They started
talking about his little girl and started arguing.  According to appellant, he and Sandra were
both being stubborn.  She started yelling
and turned over a chair; appellant had never seen Sandra so mad.  Appellant said Sandra did not want him to go,
but it is unclear whether he was referring to him moving out of the trailer or
to him going to Whitesboro to see his daughter.

Appellant said that he and
Sandra wound up in the kitchen.  She did
not want him to leave, but she was scared of him and scared of men.  She was screaming and yelling.  Appellant told Sandra=s mother that he did not go get the knife.  Sandra went into the kitchen and put the
knife in the sink.[8]  He came behind Sandra, and they were
talking.  He did not ask her why she had
the knife, and he did not run.








Cody talked to appellant
next.  Appellant told Cody that he knew
what he had done and why he was in jail. 
Cody asked appellant several times what had happened.   Appellant told Cody that he and Sandra had
watched a movie and then gone grocery shopping. 
Afterwards, they went back to Sandra=s bedroom and lay down where appellant peeled skin off her back.  According to appellant, Sandra did not want
appellant to go,[9]
and he asked her why.  They started
talking, and she went into the living room. 
According to appellant, Sandra was so angry she flipped over the leather
chair in the living room.  She was also
yelling.  Appellant said Sandra was
scared of him and of all men, and he did not know why.

According to appellant, he
and Sandra were talking about the kids and his little girl whom he was supposed
to go get that weekend.  Sandra did not
want him to go get his little girl. 
Appellant told Cody that he was standing Ain the doorway,@ and Sandra
was Apissed.@  He asked her why she was Atripping@ and afraid
of him.








Appellant told Cody that he
did not get the knife; he and Sandra had been eating beans, and the knife was
already out.  He did not know when Sandra
took the knife out.  Appellant told Cody
that Sandra put the knife in the sink. 
He also told Cody that he wanted to ask Sandra why the knife was out,
but he thought she had it because she was scared of him.  Appellant also told Cody that Sandra was
yelling and grabbed the knife, but he grabbed her arm, and she dropped it on
the table.  Appellant said that Sandra did
not come at him with the knife, and he was trying to hold her.  He got on his knees to hold her and talk to
her.  When Cody asked appellant why he Adid it,@ i.e.,
killed Sandra, appellant answered, AWe was still there in the kitchen,@ and AI don=t know.  We both wasn=t thinkin=.@

On the recording, appellant=s voice is soft and shaky, and he sounds agitated.  Although Cody=s and Sandra=s mother=s parts of the conversation can be heard clearly, it is difficult at
times to tell what appellant is saying.

3.  Analysis

For a
defendant to be entitled to a jury charge on manslaughter, the record must contain
some evidence that the defendant did not intend to kill and that the
defendant acted recklessly, i.e., that he consciously disregarded a substantial
and unjustifiable risk of death of which he was aware. Tex. Penal Code Ann. ' 6.03; Kennedy v. State, 193 S.W.3d 645, 651 (Tex. App.CFort Worth 2006, pet. filed) (en banc) (op. on reh=g); see Munoz v. State, 932 S.W.2d 242, 245 (Tex. App.CTexarkana 1996, no pet.).








Here, there is no evidence
that when appellant stabbed Sandra, he was aware of the risk of death but
consciously disregarded it.  To the
contrary, the evidence pointed to by appellant shows that he either did not know
why he stabbed Sandra or that he lost control of his senses and did not realize
until later that he had done something wrong. 
Neither of these explanations shows that appellant consciously
disregarded a known risk of death of which he was aware.  Thus, we hold that there is no evidence that
would have permitted a jury to rationally find that appellant was guilty only
of manslaughter.

B.  Second-Degree Murder

1. 
Applicable Law

During the punishment phase
of a murder trial, a defendant may argue that he caused the death while under
the immediate influence of sudden passion arising from an adequate cause.  McKinney v. State, 179 S.W.3d 565, 569
(Tex. Crim. App. 2005).  Sudden passion
is Apassion directly caused by and arising out of provocation by the
individual killed or another acting with the person killed which passion arises
at the time of the offense and is not solely the result of former provocation.@  Tex. Penal Code Ann.
' 19.02(a)(2).  An adequate cause
is a Acause that would commonly produce a degree of anger, rage, resentment,
or terror in a person of ordinary temper, sufficient to render the mind
incapable of cool reflection.@  Id. ' 19.02(a)(1).








Sudden passion is a
mitigating circumstance that, if proven by a preponderance of the evidence,
reduces the offense of murder from a first-degree felony to a second-degree
felony.  Id. ' 19.02(c), (d); McKinney, 179 S.W.3d at 569.  Thus, appellant=s contention that second-degree murder is a lesser-included offense of
first-degree murder is incorrect. 
Instead, the offenseCmurderCis the same
for guilt-innocence purposes; the difference is that a sudden passion finding
reduces the range of punishment for the offense of murder.  See Tex.
Pen. Code Ann. ' 19.02(c),
(d); McKinney, 179 S.W.3d at 569; Williams v. State, 35 S.W.3d
783, 787 (Tex. App.CBeaumont
2001, pet. ref=d).  Nevertheless, becauseCas with a lesser-included offense instructionCthe trial court should instruct the jury on sudden passion if it is
raised by the evidence, even if that evidence is weak, impeached, contradicted,
or unbelievable, see McKinney, 179 S.W.3d at 569; Trevino v. State,
100 S.W.3d 232, 238 (Tex. Crim. App. 2003),[10]
we will review his claim that he should have received a sudden passion
instruction.








To be entitled to a jury
instruction on sudden passion, a defendant must prove that there was an
adequate provocation; that a passion or an emotion such as fear, terror, anger,
rage, or resentment existed; that the homicide occurred while the passion still
existed and before there was reasonable opportunity for the passion to cool;
and that there was a causal connection between the provocation, the passion,
and the homicide.  McKinney, 179
S.W.3d at 569.  In determining whether a
trial court should have given an instruction on sudden passion, Aan appellate court=s duty is to look at the evidence supporting that charge, not . . .
the evidence refuting it.@  Trevino, 100 S.W.3d at 239.

There is no requirement that
evidence admitted at guilt-innocence be re-offered to be considered at
punishment.  Id. at 238.  Indeed, evidence on a punishment issue Awill often come out in the course of the State=s own evidence of the circumstances of the offense itself, at the
guilt phase of trial.@  Id. (quoting Williams v. State,
851 S.W.3d 282, 286 n.2 (Tex. Crim. App. 1993)).  Thus, in considering whether any evidence is
raised on this issue, we review the record from both guilt-innocence and
punishment.  Williams, 35 S.W.3d
at 787.

2.  Applicable Facts








Neither the
State nor appellant offered any additional evidence at punishment regarding
what happened the day of the murder.  The
State introduced evidence that after one of the times Sandra kicked appellant
out of the trailer, appellant was involved in a three to three-and-a-half-hour
standoff with police in which he sat in his truck and threatened to kill
himself with a handgun.  Appellant was angry
with Sandra for kicking him out of the trailer. 
       In addition, the State
offered additional testimony from Staci about appellant=s violent behavior toward her when they were dating.  For example, Staci testified that after an
argument, appellant hit her in the head with a closed fist ten to fifteen
times.  On another occasion, he hit her
in the face, and her nose started bleeding. 
Staci testified to other incidents of violence as well.  On cross-examination, Staci admitted that she
would fight back. 

3.  Analysis

According to
appellant, he was entitled to an instruction on sudden passion because the
evidence shows that Athe parties
were arguing, had prior relations which had become heated[,] and an alleged
weapon had changed hands during the fight which apparently [led] to the dea[th]
of the deceased.@  But there is no evidence that Sandra said or
did anything other than argue with appellantCand at some point during the argument, pick up (or grab) and then put
down (or drop) a knifeCthat would
cause Aa degree of anger, rage, resentment, or terror in a person of
ordinary temper, sufficient to render the mind incapable of cool
reflection.@  Tex.
Penal Code Ann. ' 19.02(a)
(emphasis added).













Appellant admitted to Cody,
Sandra=s brother, that Sandra never came at him with the knife.  Cf. McKinney, 179 S.W.3d at 570
(stating, in context of holding that the appellant was not entitled to a sudden
passion instruction, that Athe only thing Jeremy did to Appellant was yell at him and push
him.  These actions do not rise to the
level of adequate cause.  There is no
evidence that the verbal taunting and physical pushing by Jeremy@ constituted adequate cause). 
There is no evidence that Sandra had any other weapon in her hand, nor
is there any evidence that she threatened appellant.  Contra Trevino, 100 S.W.3d at 239
(holding that the appellant was entitled to a sudden passion instruction when
he offered evidence that he and his wife had a Averbal altercation@; that his wife then confronted him with a gun, pointed it at him, and
fired it twice; that the gun misfired; that the appellant went into the
bathroom to get his gun, and his wife shot at him while he was in the bathroom;
that the two struggled over the guns; and that he eventually Amanaged@ to shoot
his wife).  To the contrary, the evidence
from appellant himself indicates that Sandra was scared of him and that he was
trying to comfort her or calm her down. 
Thus, the evidence shows that although Sandra may have provoked
appellant=s anger (or
some other strong emotion) by yelling at him, arguing with him, being scared of
him, and by picking up the knife without threatening him with it, that anger Ais not objectively common in the ordinary, reasonable person [and]
does not support@ a sudden
passion instruction.  Rayme v. State,
178 S.W.3d 21, 28 (Tex. App.CHouston [1st Dist.] 2005, pet. ref=d) (quoting Saldivar v. State, 980 S.W.2d 475, 506 (Tex. App.CHouston [14th Dist.] 1998, pet. ref=d)).

Accordingly, after having
reviewed the evidence that appellant claims raises the issue of sudden passionCwithout considering the weight or credibility of that evidenceCwe hold that the trial court did not err by refusing to give a sudden
passion instruction.  We overrule
appellant=s first
issue.

V.  Self-Defense

In his
second issue, appellant contends that the trial court erred by refusing to
instruct the jury on self-defense.

A.  Applicable Law

Section 9.31(a) of the penal
code provides that Aa person is
justified in using force against another when and to the degree he reasonably
believes the force is immediately necessary to protect himself against the
other=s use or attempted use of unlawful force.@  Tex. Penal Code Ann. ' 9.31(a) (Vernon 2003). 
Subsection b provides that the use of force is not justified in response
to verbal provocation alone.  Id. ' 9.31(b).








Section 9.32 states, AA person is justified in using deadly force . . . (1)  if he would be justified in using force . . .
under Section 9.31[,] (2) if a reasonable person in the actor=s situation would not have retreated[,] (3) when and to the degree he
reasonably believes the deadly force is immediately
necessary . . . to protect himself against the other=s use or attempted use of unlawful deadly force.@  Id. ' 9.32(a).  A>Deadly force= means force
that is intended or known by the actor to cause, or in the manner of its use or
intended use is capable of causing, death or serious bodily injury.@  Id. ' 9.01(3).

A defendant is entitled to an
instruction on self-defense if evidence raises the issue, regardless of whether
that evidence is weak or strong, unimpeached or contradicted, and regardless of
what the trial court may or may not think about the credibility of the
defense.  Hamel v. State, 916
S.W.2d 491, 493 (Tex. Crim. App. 1996); Hill v. State, 99 S.W.3d 248,
250 (Tex. App.CFort Worth
2003, pet. ref=d).  A reviewing court must view the evidence or
testimony in a light most favorable to the appellant.  Dyson v. State, 672 S.W.2d 460, 463
(Tex. Crim. App. 1984).  But the
instruction is not required if the testimony or other evidence viewed in the
light most favorable to the appellant does not establish self-defense.  See Granger v. State, 3 S.W.3d 36, 38
(Tex. Crim. App. 1999) (providing standard of review for defensive
instructions).








Here, because appellant used
deadly force, there must be some evidence to show that he reasonably believed
that deadly force was immediately necessary to protect himself against Sandra=s use of unlawful deadly force and that a reasonable person in his
position would not have retreated.  See
Tex. Penal Code Ann. '' 9.31, 9.32; Dyson, 672 S.W.2d at 463; Guilbeau v. State,
193 S.W.3d 156, 159-60 (Tex. App.CHouston [1st Dist.] 2006, pet. ref=d); Flores v. State, 49 S.W.3d 29, 34 (Tex. App.CSan Antonio 2001, pet. ref=d).  In the absence of evidence
of use or attempted use of deadly force by Sandra, the section 9.32 defense is
not available.  See Werner v. State,
711 S.W.3d 639, 644 (Tex. Crim. App. 1986); Guilbeau, 193 S.W.3d at 160;
Flores, 49 S.W.3d at 34.  However,
it is only necessary that there be some evidence that appellant reasonably
believed that Sandra was using or attempting to use deadly force, not that she
actually did so.  See Hamel, 916
S.W.3d at 493; Guilbeau, 193 S.W.3d at 160.

Appellant points to evidence
that he and Sandra were arguing at the time of the stabbing, that Sandra picked
up the knife first but then put it down and he picked it up, and that he tried
to hold Sandra to calm her down as raising the issue of self-defense.  We hold that, even when viewed in the light
most favorable to appellant, this evidence does not raise the issue of
self-defense.








There is no evidence that
Sandra was using or attempting to use deadly force or that appellant reasonably
believed that she was.  According to
appellant, Sandra had already put the knife down when he picked it up.  There is no evidence that she was holding any
other type of weapon or that she was the aggressor.  Appellant told Cody that Sandra was scared of
him and that she did not come at him with the knife.  In addition, Staci=s testimony shows that appellant was bigger than Sandra.  There was also testimony that although Sandra=s hands showed cut wounds that were consistent with trying to defend
herself from being stabbed, appellant had only a small scratch on his right
thumb and no other wounds that were consistent with defending himself.  Further, the officers who investigated Sandra=s death testified that they could find no signs of a struggle in the trailer.


Accordingly, we hold that the
trial court did not err by refusing to instruct the jury on self-defense.  We overrule appellant=s second issue.

VI.  Conclusion

Having
overruled appellant=s five
issues, we affirm the trial court=s judgment.

 

TERRIE LIVINGSTON

JUSTICE

 

PANEL A:   LIVINGSTON, WALKER, and MCCOY

 

DO
NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED:
October 12, 2006











[1]It
appears from the record that before Sandra=s death, she sometimes
allowed appellant to drive her Expedition. 
When the police first arrived at Sandra=s
trailer on July 25, 2006 to check on her welfare, appellant drove up in the
Expedition, in which the police recovered the lock-blade knife.  





[2]According
to Dr. Sisler, the Avertebral
body@ is
the spine. 





[3]Officers
recovered a small screwdriver from the trailer.





[4]Detective
Lee testified that the police found a bag next to Sandra=s
body, which contained, among other things, bloody paper towels, an empty bottle
of Lysol cleaner, a sponge and washcloth that appeared to have blood on them,
and a piece of quarter round trim with blood on it.  A piece of quarter round trim was missing
from the base of the cabinet area in the kitchen.





[5]On
cross-examination, Taylor agreed when asked whether the death could have
occurred as early as Saturday morning or Aall the way to the
possibility of Sunday morning early.@  However, he also stated he did not recall the
days of the week, just the actual dates. 
On redirect, Taylor testified that Sandra=s
death could have occurred anywhere from 8:30 a.m. on the 24th to 8:30 p.m. on
the 24th.





[6]Taylor
arrived at Sandra=s
trailer at about 9:15 a.m. on Sunday, July 25.





[7]See
discussion in section IV.B. infra.





[8]Appellant=s
description of the events is not in chronological order; it is sometimes
difficult to follow the order of events as he describes them.





[9]Again,
appellant=s
references are somewhat unclear.  It
appears from the recording that appellant told Cody that Sandra did not want
him to go grocery shopping, but appellant had already said that they had been
shopping that day.





[10]However,
the evidence cannot be so weak, contested, or incredible that it could not
support such a finding by a rational jury. 
McKinney, 179 S.W.3d at 569; Trevino, 100 S.W.3d at 238.