**Gerry Don McKINNEY, Appellant,**

v.

**The STATE of Texas.**

**No. PD-1508-04.**

Court of Criminal Appeals of Texas.

Nov. 16, 2005.

---

**14.** *Mendez v. State,* 575 S.W.2d 36 (Tex.Crim. App.1979) (intent to assist reckless act).

**15.** Court's op. at 552–53, 555–56.

Ebb B. Mobley, Longview, for Appellant.

Ray Bowman, Asst. District Atty., Longview, Matthew Paul, State's Atty., Austin, for State.

MEYERS, J., delivered the opinion for a unanimous Court.

Appellant Gerry Don McKinney was convicted of murder and the jury assessed a sentence of 40 years' confinement in the Texas Department of Criminal Justice—Institutional Division and a $10,000 fine. On appeal, Appellant argued that the trial court erred in failing to include an instruction regarding sudden passion in the jury charge. The Twelfth Court of Appeals held that the trial court did not err in refusing to submit a charge on sudden passion to the jury during the punishment phase of the trial and affirmed the trial court's judgment. *McKinney v. State*, No. 12–03–00155–CR, 2004 WL 1852975, 2004 Tex.App. LEXIS 7472 (Tex.App.-Tyler August 18, 2004) (not designated for publication). We will affirm.

## I. Facts

On August 13, 2002, Appellant and the victim, Appellant's 19–year–old son, Jeremy, spent the evening doing yard work and drinking beer. Later that night, Jeremy left home to go to his friend's house.

His best friend, Jessie Elliott, testified that Jeremy had dropped by his house several times throughout that evening. At approximately two o'clock in the morning on August 14, 2002, Jeremy called his girlfriend, Samantha Garner, and told her that he was too drunk to drive home, so Garner and Appellant went to look for Jeremy to bring him home. When they did not find him at Elliott's house, Garner and Appellant continued looking for Jeremy and found both Jeremy and Elliot in the parking lot of a convenience store.

While at the convenience store, Appellant and Jeremy began to argue. Appellant testified that the argument stemmed from issues commonly dealt with when raising teenage boys, and that he was concerned because Jeremy was intoxicated and had a hot temper. He stated that during the argument, he was upset but not "out of control mad." Appellant demanded that Jeremy return home with him. Appellant and Jeremy left in one car, and Garner and Elliott followed in another. Two blocks away from their home, Jeremy demanded to be let out of the car, and Appellant allowed him to walk the rest of the distance home.

Appellant testified that while he was at the house waiting for Jeremy, he sat at his desk for a short period of time and then, because he was worried about his son going back to the convenience store and putting himself in danger, he put his gun in his pocket and headed for the door. At that same time, Jeremy was entering the house. Both Jeremy and Appellant were intoxicated.

When Jeremy entered the house, he immediately went toward Appellant, jumped on him and started pushing and shoving him, telling him to mind his own business.

Elliott and Garner tried to pull Appellant and Jeremy apart, but the scuffle continued for several minutes. When Appellant got away from Jeremy, he headed toward his room while Garner tried to hold Jeremy back. Appellant stated that he was taking the gun to his room "to just get it out—get it away from the situation." When asked why he would pull the gun out of his pocket at that particular moment, while he was fighting with his son, he testified that the gun was so heavy that it was causing his shorts to fall down during the scuffle, so when he got away from Jeremy, he took the gun out of his pocket and was going to his room to put it away.

Appellant details two versions of what took place immediately before the shooting. In the first version, Appellant testified that he thought that "the sight of the gun would scare him enough to leave me alone." When he took the gun out of his pocket, he aimed up and then shot.[1] However, Jeremy stepped in front of him as soon as he pulled the trigger.

In another version, Appellant states that while he and his son were fighting, Jeremy pushed him and he fell back, tripping over a desk, breaking the desk drawer and cutting his arm. As he hit the floor, the gun went off, striking Jeremy. Garner testified to a similar version of events. However, she claims that as Appellant fell to the ground, Jeremy said, "What are you going to do? Are you going to fucking shoot me?" Garner testified that "no sooner did the words come out of Jeremy's mouth did the shot fire." Appellant agreed that he heard Jeremy ask something "about shooting or something to that effect."

1. At trial, Appellant testified that he pulled the trigger accidently and never intended to fire the gun.

Elliott testified that he heard Jeremy curse his father, daring his father to shoot him. He stated that he heard Appellant say something to the effect of, "What if I shot you?" and Jeremy responded with something similar to, "Go ahead and shoot me." Elliott states that he then saw Jeremy shove Appellant and heard a gun shot.

When Elliott went to see what happened, he saw Appellant and Garner leaning over Jeremy's body and Appellant crying and screaming. Officers who arrived at the scene witnessed Appellant holding Jeremy in his arms and sobbing. Appellant claimed that it was an accident and that he never meant to shoot his son. Based upon the autopsy, the medical examiner determined that Jeremy died from a single gunshot wound. She additionally testified that the bullet went through the door before it entered Jeremy's head just above his right eye. Appellant was arrested and indicted for murder.[2]

## II. Court of Appeals

The court of appeals affirmed Appellant's conviction. *McKinney v. State*, No. 12–03–00155–CR, 2004 WL 1852975, 2004 Tex.App. LEXIS 7472 (Tex.App.-Tyler August 18, 2004). The court stated that the evidence raised issues of accident, self-defense, anger, and fear but such evidence alone was not sufficient to warrant an instruction regarding sudden passion. For anger or fear to rise to the level of sudden passion, the appellant's mind must have been rendered incapable of cool reflection. The court of appeals stated that the "evi-dence does not reflect fear or anger that was so strong and overpowering that it rendered Appellant incapable of rational thought and collected action." *Id.* 2004 WL 1852975, at *5, 2004 Tex.App. LEXIS at *12. In addition, "The mere fact that Appellant acted in response to [Jeremy] McKinney's provocation is not sufficient to warrant a charge on sudden passion." *Id.* 2004 WL 1852975, at *5, 2004 Tex.App. LEXIS at *13 The court held that "because there is no evidence that Appellant acted under the immediate influence of sudden passion arising from an adequate cause, the trial court did not err in refusing to submit a charge on sudden passion to the jury on punishment." *Id.*

## III. Grounds for Review and Arguments of the Parties

This Court granted review on two grounds: First, did the court of appeals misapply *Trevino v. State*, 100 S.W.3d 232 (Tex.Crim.App.2003), by focusing on the evidence that refuted a sudden passion charge rather than the evidence supporting such a charge at the punishment phase of trial? And second, does evidence of provocation by the decedent preclude a sudden passion charge at the punishment phase of a murder trial? Appellant argues that both the trial court and the court of appeals ignored evidence that raised sudden passion as an issue on which the jury should have been instructed. Appellant additionally states that under *Trevino*, 100 S.W.3d at 238, the fact that he claimed that the shooting was an accident does not

**2.** *See* Tex. Pen.Code Ann. § 19.02(b) (Vernon Supp.2004), which states that a person commits an offense if he:

    (1) intentionally or knowingly causes the death of an individual;

    (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual; or

    (3) commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual.

preclude a sudden passion charge. Finally, Appellant discusses the use of a "provoking the difficulty" instruction[3] when the issue of self-defense is raised by the defendant.

The State argues that there is no evidence to suggest a sudden or uncontrollable passion or that would render an ordinary person incapable of cool reflection. The actions of the victim, including arguing and fighting with the Appellant, were not sufficient provocation to mitigate punishment.

## IV. Law

During the punishment phase of the trial, a defendant may argue that he caused the death while under the immediate influence of sudden passion arising from an adequate cause. "Sudden passion" is "passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation." Texas Penal Code § 19.02(a)(2). "Adequate cause" is a "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." Texas Penal Code § 19.02(a)(1).

Sudden passion is a mitigating circumstance that, if found by the jury to have been proven by a preponderance of the evidence, reduces the offense from a first degree felony to a second degree felony. Texas Penal Code § 19.02(c) and (d). Thus, before a defendant is allowed a jury instruction on sudden passion, he must prove that there was an adequate provocation, that a passion or an emotion such as fear, terror, anger, rage, or resentment existed, that the homicide occurred while the passion still existed and before there was reasonable opportunity for the passion to cool; and that there was a causal connection between the provocation, the passion, and the homicide.

■ A jury should receive a sudden passion charge if it is raised by the evidence, even if that evidence is weak, impeached, contradicted, or unbelievable. *Trevino*, 100 S.W.3d at 238. However, the evidence cannot be so weak, contested, or incredible that it could not support such a finding by a rational jury. *Id.*

## V. Analysis

■ The first ground for review asks whether the court of appeals misapplied *Trevino*, by focusing on the evidence that refuted a sudden passion charge rather than the evidence supporting such a charge at the punishment stage of trial. In *Trevino* the appellant was found guilty of shooting and killing his wife. At punishment, Trevino requested a jury charge on sudden passion, which was refused. The court of appeals held that the trial court erred in denying the charge. We agreed, stating that "the problem with the State's argument is that it addresses solely the evidence against sudden passion . . . an appellate court's duty is to look at the evidence supporting that charge, not on [sic] the evidence refuting it." *Id.* at 238–39.

The evidence supporting a sudden passion charge in *Trevino* included the following: Trevino's wife was angry at him for having other women's phone numbers in his pocket so she confronted him with a .38 caliber revolver; she fired a shot at him, but missed; Trevino shot back at his wife with a 9 millimeter pistol; Trevino shot his wife three times, resulting in her death and thereafter he was "freaking out,"

---

3. *See* Texas Penal Code Section 9.31(b)(4).

scared, panicked, and in a distressed state when officers arrived; Trevino begged the officers to help his wife; and his sister also testified that Trevino "looked shocked" and was just staring out into space.

In the instant case, Appellant was never approached by Jeremy with a gun. In fact, the only thing Jeremy did to Appellant was yell at him and push him. These actions do not rise to the level of adequate cause. There is no evidence that the verbal taunting and physical pushing by Jeremy produced a degree of anger, rage, resentment, or terror in Appellant, sufficient to render his mind incapable of cool reflection.

Appellant's testimony indicates that he had time to deliberate over his actions. He testified that upon returning home, he sat down at his desk for a while and then decided to retrieve his pistol. In *Gonzales v. State*, 717 S.W.2d 355, 357 (Tex.Crim. App.1986), we stated that the appellant did not act under the immediate influence of sudden passion since the appellant "anticipated the event and prepared himself to respond to the occasion ... demonstrating a person possessed of cool reflection throughout the entire incident." Similarly, it appears that Appellant had time to consider how to deal with his son, and by retrieving his gun, he was preparing himself to respond to the altercation he was anticipating.[4]

■ An instruction on sudden passion is proper only when the sudden passion was directly caused by and arose out of provocation by the deceased at the time of the offense. Texas Penal Code § 19.02(a)(2) specifically states that passion that is solely the result of former provocation does not qualify. In *Hobson v. State*, 644 S.W.2d 473 (Tex.Crim.App.1983), the appellant stated that he had an "emotional crisis" due to the relationship between his daughter and the victim, who had recently been released from jail. The appellant followed the victim all day before finally confronting him, demanding that he get out of his daughter's life, and threatening him if he did not. Appellant and the victim fought, and Appellant stabbed the victim and cut him in the throat. We held in *Hobson* that the passion that came over the appellant did not arise at the time of the offense. *Id.* at 478. Rather, it began the morning before the crisis, when the victim was released from jail and appellant became concerned about his daughter. As a result, the altercation between the appellant and the victim just prior to the stabbing was not an adequate cause to give rise to an immediate influence of sudden passion. *Id.*

Similarly, in the instant case, the argument between Appellant and Jeremy began hours before the fatal shooting. The issues between Appellant and his son arose earlier in the evening, when Appellant and Garner went to search for Jeremy. Appellant testified that he was concerned about his son's drinking and his temper, and that their argument related to issues commonly dealt with when raising teenage boys. Appellant began fighting with his son when the two confronted each other at the convenience store. The argument then escalated into the physical altercation at home, where the shooting took place.

Evidence was presented that Appellant may have only sought to scare Jeremy and that the shooting may have been an acci-

---

4. Appellant testified that he retrieved the gun because he was worried that his son may return to the convenience store and put himself in danger. While this does not indicate that appellant anticipated an altercation with his son, it does indicate that Appellant had time to think about the situation, anticipated some sort of confrontation, and was preparing himself to respond.

dent. Appellant testified that he pulled out his gun because it was pulling his pants down and he wanted to get it out of the way. He also testified that he thought the sight of the gun would scare Jeremy and that he did not intend to pull the trigger. Both of these explanations involve an accidental shooting and neither is indicative of a response to a high level of terror or fear. The actions taken by Appellant in both explanations are deliberate and done with forethought; they are not emotional responses to provocation. Although an accident defense during the guilt phase of the trial does not preclude a sudden-passion instruction at punishment, there must be some evidence to indicate that the appellant acted under the influence of sudden passion, even if that evidence is contrary to other evidence in the case. Appellant argues only that "evidence supporting a sudden passion instruction in this case can be found independent of, and in addition to, Petitioner's own testimony." However, Appellant fails to indicate what this evidence is, and we, like the court of appeals, are unable to find such evidence in the record. As a result, the court of appeals was correct in affirming the trial court's decision to deny a sudden-passion instruction.

Appellant's second ground for review asks whether evidence of provocation by the decedent precludes a sudden-passion charge at the punishment phase of the murder trial. Appellant appears to be confused. Part of the definition of "sudden passion" is that the passion is caused by and arising out of provocation by the individual killed. Therefore, evidence of provocation by the decedent not only does not preclude a sudden-passion charge— evidence of provocation by the decedent is required for a sudden-passion charge. It is necessary, but not alone sufficient because, as we stated above, there are additional factors that are required to show that the defendant was under the immediate influence of sudden passion.

■ Finally, while there may be some evidence in this case that Appellant acted in self-defense, the issue of provocation *by the Appellant* was not raised, so a "provoking the difficulty" instruction was not given and was not warranted in this case. Appellant's discussion of the "provoking the difficulty" does not apply to provocation in the context of sudden passion. As a result, the issue is not applicable to our determination in this case. Therefore, Appellant's second ground for review is overruled.

## VI. Conclusion

The court of appeals did not improperly focus on evidence that refuted a sudden-passion instruction; it simply did not find any evidence to support such a charge. Therefore, the court of appeals did not err in affirming the judgment of the trial court.

The decision of the court of appeals is affirmed.