02-11-006-CR









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT
 OF APPEALS
 SECOND
 DISTRICT OF TEXAS
 FORT
 WORTH
  
 
 


 

NO. 02-11-00006-CR

 

 


 
 
 SEAN KRESSE
 
 
  
 
 
 APPELLANT
 
 


                                                                                                                             

V.

 


 
 
 THE
 STATE OF TEXAS
 
 
  
 
 
 STATE
 
 


 

 

------------

 

FROM THE 16TH DISTRICT COURT OF DENTON COUNTY

 

------------

 

MEMORANDUM OPINION[1]

 

------------

I.  Introduction

          In three points, Appellant
Sean Kresse appeals his punishment assessed after he pleaded guilty to murder. 
We affirm.

II.  Factual and Procedural
Background

          In his first trial, Kresse
pleaded guilty to murdering his girlfriend, Lorena Sandoval, and the jury
assessed fifty years’ confinement as his punishment.  Kresse v. State,
No. 02-09-00271-CR, 2010 WL 1633383, at *1 (Tex. App.—Fort Worth Apr. 22, 2010,
no pet.) (mem. op., not designated for publication).  We reversed the trial
court’s judgment and remanded the case for a new punishment trial.  Id.
at *3.  A new jury assessed Kresse’s punishment at ninety-nine years’
confinement, and the trial court entered judgment accordingly.  This appeal
followed.

III.  Jury Charge

          In his first two points,
Kresse complains that the trial court erred by failing to charge the jury on
sudden passion and by denying his request for an extraneous offense
instruction.  In our review of a jury charge, we first determine whether error
occurred; if error did not occur, our analysis ends.  See Abdnor v. State,
871 S.W.2d 726, 731–32 (Tex. Crim. App. 1994); see also Sakil v. State,
287 S.W.3d 23, 25–26 (Tex. Crim. App. 2009).

A.  Sudden Passion Instruction

          In his first point, Kresse
argues that the evidence showed that he became distraught when Sandoval

showed contemptuous behavior toward him, stood over
him and verbally abused him and failed to show emotional support after he lost
his job.  She had also previously threatened to have him killed[] and had
friends who sexually molested him.  She was communicating to him things
concerning how he had caused their relationship to fail[,] designed to upset
him.

Based on this evidence, he contends
that the trial court erred by refusing to give an instruction on sudden passion. 
The State responds that Kresse was not entitled to a sudden passion instruction
because the events Kresse relied on did not occur on the same day as the murder
and because although Sandoval’s actions—frowning at Kresse when he arrived home
and failing to offer him emotional support—may have provoked Kresse’s anger or
some other strong emotion, Kresse’s emotional reaction was not objectively
common in the ordinary, reasonable person.

          1.  Applicable Law

          During the punishment stage
of trial, a defendant may raise the issue as to whether he caused death under
the “immediate influence of sudden passion arising from an adequate cause.” 
Tex. Penal Code Ann. § 19.02(d) (West 2011).  “Sudden passion” means “passion
directly caused by and arising out of provocation by the individual killed . .
. which passion arises at the time of the offense and is not solely the result
of former provocation.”  Id. § 19.02(a)(2).  “Adequate cause” means
“cause that would commonly produce a degree of anger, rage, resentment, or
terror in a person of ordinary temper, sufficient to render the mind incapable
of cool reflection.”  Id. § 19.02(a)(1).

          “An instruction on sudden
passion is proper only when the sudden passion was directly caused by and arose
out of provocation by the deceased at the time of the offense.”  McKinney v.
State, 179 S.W.3d 565, 570 (Tex. Crim. App. 2005).  Passion that is solely
the result of former provocation does not qualify.  Id.; see also
Mack v. State, No. 02-05-00359-CR, 2006 WL 2925122, at *1, *10 (Tex.
App.—Fort Worth Oct. 12, 2006, pet. ref’d) (not designated for publication)
(holding, after reviewing the evidence that appellant claimed raised the issue
of sudden passion, that appellant was not entitled to the instruction when the
evidence showed that although live-in girlfriend may have provoked his anger or
another strong emotion by yelling at him, arguing with him, being scared of
him, and by picking up a knife without threatening him with it, appellant’s
anger was not “objectively common in the ordinary, reasonable person”).

          A jury should receive a
sudden passion instruction if it is raised by the evidence, even if that
evidence is weak, impeached, contradicted, or unbelievable, but the evidence
cannot be so weak, contested, or incredible that it could not support such a
finding by a rational jury.  McKinney, 179 S.W.3d at 569 (citing Trevino
v. State, 100 S.W.3d 232, 238 (Tex. Crim. App. 2003)).

2.  Evidence

          Kresse refers us to the
following portion of his testimony in support of his sudden passion argument.  On
the evening of the murder, Kresse had a beer[2]
before learning that he had been fired, then picked up two 24-ounce beers on
his way to Nathan Fleming’s house, where he drank both beers.  At 8:42 p.m., Kresse
received a text message from Sandoval asking where he was.  He called her back
and started walking home.  He then gave the following testimony about his
thoughts on the way home:

Q.  What were you—were you thinking about anything on
your way home?

 

A.  Yeah, I was.

 

Q.  What?

 

A.  I mean, everything started piling up on me, the
weight of how the relationship was going, how—because, you know, like I said,
it was my first relationship.  It was good, beautiful.  I can’t ask for
anything more out of a relationship.  God blessed me.

 

          Like I said, later on, I mean, it got pretty
cold. 

 

Q.  What do you mean?

 

A.  Just she would—she had a lot of—she had a lot of
things that, you know . . . . 

 

Q.  What do you mean?

 

A.  I mean, we split apart and got back together a
lot.  One minute it was—it was—it was great.  One day we were happy to see each
other.  And the next day, she would grab all my stuff or grab whatever she
could in the living room and throw it in a pile and say, [“]Get this stuff out
of here.[”]

 

          You know, the next day it would be fine
again.  You know, a couple of times she actually, you know, told me she thought
about having me killed.

 

Q.  Did you believe her?

 

A.  At first, no, I didn’t.

 

          But then one time she said it, and I started
laughing, and she said, [“]I’m not joking, I’m not laughing.[”]

 

          She would actually—she whispered it a couple
of times, when we were laying down, she said, [“]I thought about killing you, I
thought about having you killed.[”]

 

Q.  How did that make you feel, [Kresse]?

 

A.  Absolutely horrible.

 

Q.  What else?

 

A.  Unfortunately there is a lot else.  Early in the
relationship, I was actually sleeping in bed one night, I woke up.  I wasn’t
fully awake, I was a pretty heavy sleeper.  But somebody was—as I was laying on
my stomach, somebody was lifting my arms up, had them behind my back, lifting
them above my head, I saw people taking pictures and some guy kissed me on the
face.

 

Q.  Do you know who it was?

 

A.  Yeah, it was her friends Pedro and Maggie.

 

Q.  Was she there?

 

A.  Yeah, she was there.

 

Q.  Did you ever try to talk to her about that?

 

A.  Yeah, actually I tried to talk to her about that
one and another situation.

 

Q.  What other situation?

 

A.  In October of 2006, I was working two jobs.  I was
working at Hooligan’s and at the haunted house.  I mean, I worked from nine
a.m. in the morning—I got up at seven and walked to Hooligan’s from 35 and
Bonnie Brae, and I worked from nine o’clock ‘til two in the morning.  I mean,
I’m trying to get some sleep.

 

          And when I wake up, she had met this gay dude
at the haunted house.  When I woke up, this gay guy was in my pants.

 

Q.  Did you ever report that to the police, [Kresse]?

 

A.  No, I didn’t.  It was pretty freaking humiliating.

 

Q.  Do you know who it was?

 

A.  Yeah, I just know the guy’s name.

 

Q.  His name was what?

 

A.  He had a stage—his name was Randy, but they called
him Rain.

 

Q.  So you’re thinking about all this as you’re
walking and you got to the apartment.  What happened?  Was the door locked or
not?

 

A.  Yeah, it was locked.

 

Q.  Was it deadbolted?

 

A.  Yeah, I had the key to the door, but the top
deadbolt was locked.  I couldn’t get the door open.

 

Q.  How did she answer the door?

 

A.  Just like a normal person, she kind of cracked it
a little.  Once she saw it was me, she frowned and gave me a dirty look, like
one of those moods where she really didn’t want me to be there.  Then all of a
sudden she just jumped back and smiled and greeted me.

 

Q.  How did that make you feel, [Kresse]?

 

A.  Like she was pretending to be nice to me, like she
really didn’t want me to be there.

 

Q.  Then what?

 

A.  Like I was thinking to tell her on the way back,
like I was trying to have all my debt settled and help her pay her bills, and
everything because I still had hospital bills from the evading resisting charge
when I fell and hit my head.  And we were talking about getting my own
apartment, helping me get on my feet, because it’s something we both wanted, it
would be easier on us.

 

          I mean, we were talking about—I’m sorry let
me get back to what I was saying.

 

          I was thinking about all that stuff and –

 

. . . .

 

Q.  What happened after you got there, [Kresse], and
after she opened the door?

 

A.  I walked into the bedroom and sat down on the bed
because I had to tell her, you know, that I was drinking, I wasn’t supposed to
be drinking, I had to apologize to her for that, and I had to tell her I lost
another job and things were going to get hard for me.

 

Q.  Were you crying?

 

A.  I was.

 

Q.  How did she respond?  Or did she?

 

A.  Yes, and she was just kind of used it as an excuse
to beat up on me again.

 

Q.  Do you mean verbally?

 

A.  Yes.

 

Q.  And what happened?  What do you remember next?

 

A.  That I completely lost control.  I jumped up on
the bed and I . . . grabbed her by—she was standing in front of me, and I
grabbed her by the neck.

 

Q.  What’s the next thing you remember, [Kresse]?

 

A.  I remember falling to the
ground with her on top of me, and then the next time she was limp in my arms.

Kresse said that after he choked her,
he was panicked and scared and made several phone calls.

          During cross-examination,
Kresse admitted that the incident involving Pedro and Maggie taking his photo
was in March 2006, around a year and a half before the murder, and the incident
involving the “gay dude” occurred in October 2006.  He did not remember what
Lorena said to him on the night of the murder, stating only that “it wasn’t,
you know, the emotional support I was needing at that time.”  He then gave the
following testimony:

Q.  And based on your earlier testimony, she did
nothing to instigate this, she just didn’t give you emotional support; is that
correct?

 

A.  Yeah.  I just—I lost control.  Just the way
everything that had been going on, and then giving her every chance to change,
and it just didn’t seem like it was going to happen.  Seemed like I was going
to either wake up dead or molested again.

 

Q.  And so you had given her every chance to change,
and that wasn’t happening?

 

A.  Yeah.

 

Q.  So you choked her?

 

A.  I blew up.

Kresse said that he could not remember
how long he choked Sandoval and that he blacked out at that point.  He
concluded his testimony by stating that he accepted responsibility for what
happened and that he did not blame anything on Sandoval.

          Kresse argues that the
facts set out above are evidence of sudden passion because

[h]e had acted fairly normally all day prior to
arriving him [sic], given the news of his firing.  He visited a friend who saw
no sign of impending violence.  But immediately before he grabbed [Sandoval’s]
throat, he was in an agitated emotional state because of her verbal abuse and
past actions.

          Under the circumstances
presented here, however, we cannot say that Kresse was entitled to an
instruction on sudden passion.  First, Kresse’s testimony reflects that he was
concerned with former provocation occurring up to a year before the murder and
not on provocation directly caused by Sandoval at the time of the offense.  Cf.
McKinney, 179 S.W.3d at 570 (stating that passion that is solely the
result of former provocation does not qualify for the instruction on sudden
passion).

          Further, Kresse’s testimony
about Sandoval’s actions that night—the “dirty look” she gave him and the
verbal abuse that he could not recall but that was not “the emotional support”
he wanted after he lost his job several hours (and beers) earlier—would not
commonly produce the degree of anger, rage, or resentment in a person of
ordinary temper.  See id. (holding that the victim pushing and
yelling at the defendant just before the shooting was not adequate cause to
give rise to an immediate influence of sudden passion when the fight began
earlier in the day and the defendant had time to deliberate over his actions
and prepare his response); see also Mack, 2006 WL 2925122, at *1,
*10.  Rather, Kresse admitted at trial that he had a problem with alcohol,
although he said that he had not been aware of it at the time of the murder. 
He also admitted that alcohol affected his temper, which additional evidence at
trial supported,[3]
and that he had been drinking alcohol before the murder.

          Other witnesses also
testified about Kresse’s drinking that day:  Ballard, Kresse’s co-worker,
testified that he and Kresse had a few beers between 4:30 and 5:45 p.m. that
day and that when Ballard left work, Kresse was still drinking.  Fleming said
that Kresse stopped by his house, uninvited, with a couple of beers—described
by Kresse as two twenty-four ounce beers —around 6:00 or 7:00 p.m. and stayed
until around 9:00 p.m.  Fleming said that Kresse became a little drunk and
started being “more mouthy” and disagreeable, seeming to be more intoxicated
than just a couple of beers would account for.  Fleming’s wife testified that
Kresse became confrontational with her while they played darts that night.[4] 
Kresse explained that Fleming’s wife might have taken his behavior as “mouthy,”
but he said that he was trying for light-hearted humor and “not really trying
to attack them at all.”

          Kresse left the Flemings’
house around 8:30 or 9:00 p.m., after he received Sandoval’s text message, and
started walking home.  Between the time that Kresse arrived home and 10:22
p.m., when Reese called him, Kresse choked Sandoval to death.

          When Kresse spoke with
Reese at 10:22 p.m., he sounded “out of it . . . short of breath, kind of
slurring a lot, mumbling.”  Reese said that Kresse told him that he was “laying
here looking at [his] girl’s limp, lifeless body.”  Reese thought Kresse was
joking, so he told Kresse to put a mirror under Sandoval’s nose to see if she
was breathing.  Kresse told him to hold on and background noises made him think
that Kresse dropped the phone and stumbled around in the house; when Kresse
returned, he said, “Now what?”  When Reese asked him what was going on, Kresse
told him, “Don’t pay attention to me, I’ve been drinking a lot after work,” and
hung up on him.

          Around 11:00 p.m., Kresse called
his brother Jack, who said that Kresse sounded like he had been drinking; Jack
called their mother, Sheila, who noticed that she had missed several calls from
Kresse.  She called Kresse after she spoke with Jack.  Kresse told her that
there was something wrong with Sandoval, and he sounded hysterical.

          At 11:33 p.m., Kresse
called Dave Ogozalik, one of his former work supervisors, and asked him if he
knew anything about CPR or first aid; Ogozalik told him to hang up and call
911.  Sheila arrived at the scene forty-five minutes after she spoke with
Kresse on the phone; she found Sandoval on the floor with her head on a mirror.
 Sheila called 911, checked Sandoval’s pulse, and started CPR.

          Between 11:30 p.m. and
midnight, emergency medical personnel and police were dispatched to Kresse’s
apartment; a paramedic noted that Kresse used profanity with him when he asked
for Sandoval’s medical history, telling him, “Mother-F’er, you need to get back
to F’ing work.”  Police officers noted that Kresse’s demeanor was abrasive and
“all over the place”; they could tell that Kresse was intoxicated and had to
restrain Kresse when he tried to go with the ambulance.  Kresse resisted their
efforts, lunged at one of the officers when he was released, and was arrested
for public intoxication.[5]
 We overrule Kresse’s first point.

B.  Extraneous Offense Instruction

          In his second point, Kresse
states that the instruction given by the trial court did not fully inform the jurors
of how they were required to use extraneous offenses in assessing punishment.  The
State responds that the trial court properly instructed the jury on extraneous
offenses.  We agree.

          The trial court’s
instruction to the jury read as follows:

You are instructed that if there is testimony before
you in this case regarding the defendant having committed other acts or
participated in other transactions other than the offense alleged against him
in the indictment in this case, that you cannot consider such other acts or
transactions, if any, unless you first find and believe beyond a reasonable
doubt that the defendant committed such acts or participated in such
transactions, if any, but if you do not so believe, or if you have a reasonable
doubt thereof, you will not consider such testimony for any purpose.

Kresse argues that the trial court
should have included his requested addition to the extraneous offense
instruction:  “In the event that you do believe beyond a reasonable doubt, such
evidence may be used solely for the purpose of determining the proper
punishment for the offense to which the Defendant has been found guilty.”

          Code of criminal procedure
article 37.07, section 3, governs the admissibility of evidence at punishment
in all non-capital cases.  Huizar v. State, 12 S.W.3d 479, 483–84 (Tex.
Crim. App. 2000) (op. on reh’g); see also Tex. Code Crim. Proc. Ann.
art. 37.07, § 3 (West 2006).  Further, the court of criminal appeals has
recognized in unequivocal terms that extraneous offense evidence may not be
considered by the jury in assessing punishment “until the fact-finder is
satisfied beyond a reasonable doubt that [such acts and offenses] are
attributable to the defendant. . . .  Once this requirement is met, the
fact-finder may use the evidence however it chooses in assessing punishment.”  Huizar,
12 S.W.3d at 484 (quoting Fields v. State, 1 S.W.3d 687, 688 (Tex. Crim.
App. 1999)).  As set out above, Kresse received an instruction from the trial court
meeting this description.

          Nonetheless, Kresse argues
that the instruction could leave no doubt that the jury could not “simply tack
on extra time based on the extraneous offenses.”  He relies on Lomas v.
State, 707 S.W.2d 566 (Tex. Crim. App. 1986), and Klueppel v. State,
505 S.W.2d 572 (Tex. Crim. App. 1974), to support his argument.  However, Lomas
and Klueppel are inapposite because in both cases, the appellant argued,
and the court of criminal appeals held, that the State made improper closing
arguments by inviting the jury to sentence the appellant for offenses
collateral to the charged offense.  See Lomas, 707 S.W.2d at 567,
570; Klueppel, 505 S.W.2d at 574–75.  Kresse does not complain about the
State’s closing argument.

          Furthermore, as pointed out
by the State, Lomas and Klueppel were decided before the legislature’s
1993 amendment of code of criminal procedure article 37.07, section 3(a), to allow
for the introduction of evidence of unadjudicated extraneous offenses during
the punishment phase of trial.  See Arthur v. State, 11 S.W.3d 386,
391–92 (Tex. App.—Houston [14th Dist.] 2000, pet. ref’d) (explaining that under
the new version of article 37.07, section 3(a), once the trial judge has made a
threshold determination that the extraneous offense evidence is relevant and
the factfinder is satisfied beyond a reasonable doubt that the prior acts are
attributable to the defendant, “the fact-finder may use the evidence however it
chooses in assessing punishment”).  The jury is allowed to consider these
extraneous offenses to allow it to “learn ‘as much useful information as
possible in deciding the appropriate punishment for the individual
defendant.’”  Id. at 392 (citing Mendiola v. State, 924 S.W.2d
157, 163 (Tex. App.—Corpus Christi 1995, pet. ref’d, untimely filed)).  Kresse
has cited us to no authority requiring more than the instruction given by the
trial court under section 37.07, section 3(a);[6]
instead, he merely speculates that the jury improperly increased his sentence
based on the extraneous offenses.  We overrule his second point.

IV.  Confrontation

          In his third point, Kresse
argues that the trial court erred by admitting into evidence the tape of Sandoval’s
April 3, 2007 911 call, complaining that there was no authentication of the
person on the 911 tape as Sandoval and that it was therefore inadmissible
hearsay.  However, as pointed out by the State, Kresse never raised
authentication at trial.

          Kresse objected “under 6th
Amendment to the United States Constitution, the 14th Amendment to the United
States Constitution, Article 1, Section 10 of the Texas Constitution, and
hearsay found in the Texas Rules of Evidence.”  The State replied, 

[B]ased on those objections, we would just argue that
in Crawford and Davis, a 9-1-1 is considered nontestimonial, which overcomes
the 6th Amendment and the other objections.  If it’s related to an ongoing
emergency, the hearsay objections can be overcame [sic] by excited utterances
made by the individual on the other end of the line and present-sense
impressions of the things that that person is seeing when they are relaying
that information to the 9-1-1 operator.

Kresse then clarified, “Judge, I
would just say that based on the content of the 9-1-1 call, it’s clear that
there’s not such an ongoing emergency at that time, and I would argue that it
is testimonial and falls outside of those exceptions he just stated to you.” 
The trial court overruled the objections and admitted State’s Exhibit 104, the
9-1-1 call recording.  Because Kresse did not raise the authentication argument
in the trial court, he has not preserved it for our review.[7] 
See Tex. R. App. P. 33.1(a); Lovill v. State, 319 S.W.3d 687,
691–92 (“A complaint will not be preserved if the legal basis of the complaint
raised on appeal varies from the complaint made at trial.”).  We overrule
Kresse’s third point.

V.  Conclusion

          Having overruled all of
Kresse’s points, we affirm the trial court’s judgment.

 

                                                          PER
CURIAM

 

PANEL:  MCCOY, J.;
LIVINGSTON, C.J.; and DAUPHINOT, J.

 

DO NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED:  February 23, 2012









[1]See
Tex. R. App. P. 47.4.





[2]Hunter
Ballard, Kresse’s co-worker, testified that he and Kresse each had three to
five beers around 4:30 or 5:00 p.m. that afternoon and that Kresse was still
drinking when Ballard left work between 5:45 and 6:15 p.m.





[3]In addition to testimony about Kresse’s drinking on
the day of the murder, witnesses testified about two instances in 2006 when
Kresse’s reactions were outside that of a person of ordinary temper after he
had been drinking.

 

In one instance, Kresse was involved in an incident
outside a bar in Denton around 1 a.m.  University of North Texas Police Officer
Jeff Arrington testified that he ended up pursuing Kresse, that Kresse was very
combative, and that he was unable to handcuff Kresse until backup arrived.  Kresse
admitted that he had been drinking that night.

 

In the second instance, according to Sandoval’s
brother, when Kresse went to a concert in El Paso with him and Sandoval, Kresse
started a fight on his way to get more beer and was kicked out of the concert.  Kresse
said that he had only had one beer that night, that it was not his fault that
he became involved in a fight, and that he had spit on some people and broken a
man’s nose that night.  Scott Reese, one of Kresse’s former work supervisors,
testified that Kresse could get “out of control a little bit” when he drank
alcohol.

 

The trial court also admitted and allowed publication
of the 911-tape from an April 3, 2007 incident, in which Sandoval reported that
Kresse was drunk, that he had been pushing her around and spitting in her face,
and that she wanted him to leave.





[4]The
Flemings both testified that on a previous occasion in August 2007, Kresse had
previously come over to their house, started drinking, and become “mouthy,”
confrontational, and rude.





[5]At
12:32 a.m., Sandoval’s body arrived at the hospital, and she was pronounced
dead at 12:43 a.m.





[6]Article
37.07, section 3(b) provides that if the jury has the responsibility of
assessing punishment, “the court shall give such additional written
instructions as may be necessary and the order of procedure and rules
governing the conduct of the trial shall be the same as are applicable on the
issue of guilt or innocence.”  Tex. Code Crim. Proc. Ann. art. 37.07, §
3(b) (emphasis added).  However, Kresse has not shown that an instruction
beyond what the trial court gave the jury was necessary under the circumstances
presented here.





[7]Further,
during his cross-examination of 911 dispatcher Michelle Pruett, Kresse referred
to Sandoval as the caller.