**Opinion issued January 31, 2013**



In The

# Court of Appeals

For The

# First District of Texas

―――――――――――――

## NO. 01-11-01052-CR

―――――――――――――

**JERRY BELTON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 228th District Court**
**Harris County, Texas**
**Trial Court Case No. 1257810**

## MEMORANDUM OPINION

Appellant Jerry Belton pleaded guilty without an agreed sentencing recommendation to the charge that he murdered his wife. *See* TEX. PENAL CODE ANN. § 19.02 (West 2011). He also pleaded true to an enhancement allegation that

he had been convicted previously of the second-degree felony offense of attempted murder. The trial court ordered that a presentence investigation report be prepared. After considering the PSI report, the trial court sentenced him to life in prison.

In his sole issue on appeal, Belton argues that he was under the immediate influence of a sudden passion when he murdered his wife, and therefore the court should have sentenced him within the statutory range for a second-degree felony rather than a first-degree felony. *See id.* § 19.02(d). We affirm.

**Background**

According to Belton, who is deaf and mute, he traveled from his home in Louisiana over the Easter weekend in 2010 to visit with his estranged wife, Chandra, and his teenaged daughter, J.B. Belton said he had been separated from Chandra because of her prior infidelity, but she had asked him to visit to determine if reconciliation was possible. His family in Louisiana advised him not to make the trip and warned him that the "relationship was too upsetting and volatile." He later told police investigators that he brought a gun with him to Houston "for protection" against Chandra's "new boyfriend."

Belton arrived at his wife's home on Friday night, and that evening he "was having a good time." There was "a big dinner" and he began to believe that the family "could put our live[s] back together." The next day, however, he became disturbed when Chandra took J.B. shopping without him and returned after

2

midnight, "too drunk to talk." Belton was "very upset," believing that Chandra had endangered their daughter.

The next day, Chandra was "ugly" to Belton during church services, and she talked and argued with another man. When they returned from church they discovered some spoiled food, so Belton and Chandra left the house in her sports utility vehicle, ostensibly to go to the grocery store. J.B. told investigators that her parents were arguing about her mother's new boyfriend when they left the house.

In his written statement to the court, Belton described the events that followed:

> We left in my car. I hoped it would be a good chance to talk about what happened the night before when she came home drunk. I tried to talk to he[r] about it but while we were sig[n]ing she got a cell phone call. She turned away from me and began talking to another man. I could see her in the view mirror and I could lip read enough to know what she was saying
>
> I could not believe she would get me to come to Houston only to be this way with me. I bec[a]me enraged. I couldn't think straight. I remember[e]d that I had a pistol under my car seat. I pulled on a parking lot. I got the gun in a state of anger.

Belton drove into the empty parking lot of Big H Auto Auction, where he had once worked. He told police investigators that "his wife hit him next to his ear and he became angry. When his wife saw the gun he had inside his waistband, she got out and ran to the back of her SUV." He felt "crazy anger," and then he shot and killed Chandra.

3

Three witnesses gave statements to police about the murder. S. Garrison was working that afternoon as a security guard at Big H Auto Auction. She saw a sports utility vehicle drive to the back of the parking lot. The vehicle was parked for five to eight minutes, and then a man and a woman got out and walked a short distance away. Garrison heard the woman scream and saw the man shoot her once. After the woman fell to the ground, the man shot her two more times. Garrison called the police, and the man drove away, leaving the woman there. Z. Davis was also working as a security guard that afternoon, and he told an investigator that it appeared to him that the couple was arguing inside the vehicle. He saw the man shoot the woman three times before driving away. A third witness was working approximately 35 yards away and heard three gunshots.

Belton returned to Chandra's home, parked her SUV in the driveway, handed her keys to their daughter, and left in his car. Around 5:00 p.m., Harris County Sheriff's deputies found Chandra lying in the parking lot with a large pool of blood beneath her head. She was pronounced dead at the scene. An autopsy report showed that Chandra had suffered five bullet wounds—two to her head, one to her breast, and one each to her left and right hands and wrists. The medical examiner concluded that her death was a homicide caused by multiple gunshot wounds. Sheriff's deputies investigating the murder scene found no shell casings,

4

but they did find Chandra's mobile phone, which had broken into three pieces. They were able to recover the following three text messages:

- She's mine now sorry u lost

- I told u im hear in Htown ur city stop calling my wife

- I c ur picture on my wife phone pls stop calling her.

The PSI report characterized these messages as having "appeared to have been sent from one male to another."

Belton was arrested in Louisiana, and he later confessed to shooting Chandra several times. He also told police that this was the third time he had discovered Chandra cheating on him, and "he had become used to it." He pleaded guilty to murder without an agreed recommendation as to punishment, and the trial court ordered the preparation of a PSI report.

At the punishment hearing, Belton requested that the trial judge take judicial notice of his written statement, which was included in the PSI report. The only evidence formally offered and admitted at the hearing was a group of family photographs of Chandra. The PSI report included information about Belton's prior offenses. In 1987, when Belton was 28 years old, he was convicted of two counts of aggravated battery for stabbing a woman 11 times with a kitchen knife and for stabbing an 11-month-old baby four times with a large kitchen knife and breaking his arm. In 1988, Belton was convicted of attempted second-degree murder for

stabbing a nurse six times with a large knife. The PSI report also included numerous statements, many nearly identical, from Belton's family and friends describing Chandra as selfish and greedy, indicating their support for Belton, and stating that Belton was "raised as a God fearing man by his grandmother," that the accusations against him were "not in his character," and that he "would not purposely hurt her." The letters also indicated that Belton had "moved on with his life" and was in a relationship with a woman who lived in Louisiana.

The trial court sentenced Belton to life in prison, and this appeal ensued.

**Analysis**

On appeal, Belton contends that he established "as a matter of law" that Chandra's murder occurred while he was under the immediate influence of sudden passion, and therefore his offense was a second-degree felony instead of a first-degree felony. This is a challenge to the legal sufficiency of the evidence to support the trial court's finding to the contrary in the context of sentencing. In reviewing a criminal defendant's legal sufficiency challenge to a negative finding on a sentencing issue for which the defendant had the burden of proof, we first examine the record for evidence that supports the negative finding, and, if no evidence supports the negative finding, then we examine the entire record to determine whether it establishes the contrary proposition as a matter of law. *Smith v. State*, 355 S.W.3d 138, 148 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd).

6

At the punishment phase of a murder trial, the offense will be reduced from a first-degree felony to a second-degree felony if the defendant affirmatively proves by a preponderance of the evidence that "he caused the death under the immediate influence of sudden passion arising from an adequate cause." TEX. PENAL CODE ANN. § 19.02(d); *see also Hernandez v. State*, 127 S.W.3d 206, 211–12 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd). "'Sudden passion' means passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation." TEX. PENAL CODE ANN. § 19.02(a)(2). "'Adequate cause' means cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." *Id.* § 19.02(a)(1).

"Neither ordinary anger nor fear alone raises an issue on sudden passion arising from adequate cause." *Moncivais v. State*, No. 01-09-01131-CR, 2011 WL 2936360, at *2 (Tex. App.—Houston [1st Dist.] July 21, 2011, pet. ref'd). Rather, such anger or fear must render the defendant incapable of cool reflection. *See Gonzales v. State*, 717 S.W.2d 355, 357 (Tex. Crim. App. 1986). "A defendant must prove that the homicide occurred while the passion still existed and before there was reasonable opportunity for the passion to cool." *Moncivais*, 2011 WL

7

2936360, at *3 (citing *McKinney v. State*, 179 S.W.3d 565, 569 (Tex. Crim. App. 2005)). "Anticipation of an event and preparation of a response indicates a defendant had time to deliberate over an action and did not act under the immediate influence of sudden passion." *Id.* Evidence of premeditation is sufficient to support a finding of no sudden passion. *Nance v. State*, 807 S.W.2d 855, 861 (Tex. App.—Corpus Christi 1991, pet. ref'd).

The PSI report is part of the appellate record, and there were no objections to it at the sentencing hearing. The record shows that Belton and Chandra were separated, and both had become involved in other relationships. Belton drove from Louisiana to Houston with a gun. Belton told investigators he had become used to Chandra's infidelity. He knew of her extramarital affair, and the text messages found on Chandra's phone suggested some direct communication between Belton and Chandra's boyfriend. Belton left the house with Chandra, drove her to an empty parking lot, and shot her multiple times, including twice after she had fallen to the ground. He then drove to his wife's home, gave her keys to their daughter, retrieved his car, and returned to Louisiana.

Belton's actions, specifically in driving from Louisiana to Houston with a gun and in taking Chandra to a secluded location before killing her, support an inference of preparation and premeditation, and therefore the record supports the trial court's negative finding on the issue of sudden passion. Apart from his

8

request that the trial court take judicial notice of his written statement, Belton presented no evidence at the punishment hearing to substantiate a claim of sudden passion. His contention that he became angry about Chandra's phone conversation while they were in the car was insufficient as a matter of law to establish an adequate cause. He already knew that she was having an extramarital affair. *See Hernandez*, 127 S.W.3d at 213 ("Sudden passion must arise at the time of the offense and cannot result solely from former provocation."); *cf. Bradshaw v. State*, 244 S.W.3d 490, 503 (Tex. App.—Texarkana 2007, pet. ref'd) (holding that estranged spouse's discovery of extramarital relationship would not commonly produce in a person of ordinary temper a degree of anger, rage, resentment, or terror sufficient to render the mind incapable of cool reflection).

Having found that the trial court's negative finding is supported by the record, and that there is no evidence to support the contrary position, we conclude that the evidence is legally sufficient to support the sentence, and we overrule Belton's sole issue. *See Smith*, 355 S.W.3d at 148.

## Conclusion

We affirm the judgment of the trial court.

Michael Massengale
Justice

Panel consists of Justices Keyes, Massengale, and Brown.

Do not publish.   TEX. R. APP. P. 47.2(b).