**Opinion filed July 14, 2022**



In The

# Eleventh Court of Appeals

_____

## No. 11-20-00237-CR
_____

### TIMOTHY JON DWELLE, Appellant

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the 350th District Court**

**Taylor County, Texas**

**Trial Court Cause No. 13443-D**

## M E M O R A N D U M   O P I N I O N

Appellant, Timothy Jon Dwelle, was indicted for the murder of Patricia Smith Ford. *See* TEX. PENAL CODE ANN. § 19.02(b)(1), (2) (West 2019). In paragraph one of the indictment, the State alleged that Appellant intentionally and knowingly caused the death of Ford by striking her with a hatchet. *See id.* § 19.02(b)(1). In paragraph two of the indictment, the State alleged that Appellant intentionally and knowingly, with intent to cause serious bodily injury, committed an act clearly

dangerous to human life by striking Ford with a hatchet and causing her death. *See id.* § 19.02(b)(2). Appellant waived his right to a trial by jury and entered a plea of guilty to the offense charged in paragraph one. *See id.* § 19.02(b)(1). Following the punishment hearing, the trial court assessed Appellant's punishment at imprisonment for fifty years in the Institutional Division of the Texas Department of Criminal Justice. In his sole issue on appeal, Appellant challenges the sufficiency of the evidence to support the trial court's rejection of Appellant's mitigation defense of sudden passion. We affirm.

## I. *Factual and Procedural Background*

On September 20, 2016, Carol Rolin, Ford's daughter and only child, called the Abilene Police Department to file a missing person's report concerning Ford. Rolin spoke with Officer Jay Tollison, who began a preliminary missing person investigation into Ford's whereabouts. During his investigation, Officer Tollison learned that Ford was a probationer in Taylor County and that Ford had not been reporting to the probation department as required. Although Ford did have several permanent or temporary residences during 2016, Officer Tollison was able to locate Ford's last known address: a converted duplex in Abilene that Appellant owned. However, Officer Tollison was unable to locate Ford at that address, and Ford's close friends indicated that they had not seen Ford in quite some time.

In January of 2017, Rolin went to the Abilene police station and provided a sample of her DNA. Because Ford had been previously incarcerated, her DNA profile was in the State DNA Index System. Officer Tollison searched for Ford throughout 2017; his investigation lasted approximately one and a half years in duration, from fall of 2016 through spring of 2018. On May 7, 2018, Officer Tollison received "a tip that [Ford] may have been . . . murdered and put under the house at" Ford's last known address. Officer Tollison subsequently transferred the

2

investigation of this case to the investigators in the Crimes Against Persons department.

Paul Martinez, a detective with the Abilene Police Department, was assigned to the Crimes Against Persons department in 2018, when his sergeant sent him to aid the officers in their investigation at Ford's last known address. When Detective Martinez arrived at the address, he was informed that "there were two cutouts on the house, one on the left side, one on the right side." Detective Martinez explained that, because the house was formerly a duplex, the main area had two identical sides with a furnace in the center. The cutouts were identical, perfectly cut rectangles on either side of the furnace that were "able to be picked up and put back down." The officers "had lifted up the floor cutouts and looked under the house and noticed that the dirt appeared to be overturned" in the crawl space.

Brenda Martinez had been living at that address with her children for the preceding four months. She informed Detective Martinez that the owner of the property was Appellant, who had left for Dallas and had asked her to watch over the house. Martinez signed the officers' consent-to-search form and additionally gave verbal consent for Detective Martinez and others to search any part of the house. Detective Martinez entered the crawl space and proceeded to dig in certain areas where he noticed that dirt appeared to be overturned. In the crawl space underneath one of the cutouts, Detective Martinez "started noticing that there were . . . what appeared to be small bones, almost like a chicken bone." Other, smaller bones were also visible in the immediate area and Detective Martinez photographed and collected them. When it became apparent to him that the bones he discovered could be human bones, Detective Martinez terminated his search so that a search warrant could be obtained.

After the first search warrant was issued, fire department officials cut larger holes into the floor of the house to aid the officers' ability to search the crawl space. During the searches, multiple bones were discovered in the dirt underneath Appellant's house. A local physician examined the bones and concluded that "they appeared to be a human foot." The Tarrant County medical examiner's office subsequently confirmed that the recovered bones were human—"pieces of both hands, a foot, a knee, and two skeletal pieces."

Detective Martinez applied for and obtained a second search warrant for Appellant's property because the medical examiner was unable to determine "if the person was just missing some limbs or if they were deceased." Throughout several days of digging, additional bones were discovered, along with "some stuff that appeared to be hairs." A cadaver dog had alerted inside the house and in the backyard; however, no additional evidence was discovered in the backyard. Following this search, Detective Martinez sent multiple bone fragments, some socks that he found underneath the house, and the hairs to the medical examiner. Later that month, at the end of June 2018, Rolin and her husband visited the Abilene police station, where they spoke with detectives "generally about their suspicions on what may have happened to [Ford]."

On July 3, 2018, Rolin and her husband returned to the Abilene police station with "additional information" in regard to Appellant and his involvement in Ford's disappearance. Rolin or her husband had purchased a recorder at Walmart, which she had concealed under her clothes when they met with Appellant in a motel room. While they spoke, Appellant "continued to mention certain things about Ms. Ford and the incident," and Appellant ultimately divulged to Rolin that he had killed her mother. In light of Appellant's recorded confession to Rolin and the evidence discovered at Appellant's house, officers obtained a warrant for Appellant's arrest.

Appellant was arrested on July 4, 2018. The next day, officers obtained a third search warrant for Appellant's house because the rest of Ford's remains had yet to be found. A search of the attic revealed a green sea bag that had been concealed in a microwave box. Inside the sea bag, officers discovered more human bones and a human skull. DNA testing performed on these bones was compared to the sample of Rolin's DNA that Officer Tollison had obtained; the results showed that these bones belonged to the biological mother of Rolin. Additionally, the DNA extracted from these bones matched Ford's DNA that was in CODIS.

On July 25, 2020, Appellant waived his right to a trial by jury and pleaded guilty to the offense of murder as charged in paragraph one of the indictment. At the punishment hearing, Detective Martinez testified that, on the recording of Appellant's confession to Rolin:

> [Appellant] stated that [Ford] had mentioned sending [Rolin] back to prison and [Appellant] snapped and went to the kitchen and got a hatchet out of the kitchen and then walked into the bedroom where [Ford] was sitting in a rocking chair and [Appellant] killed her.

Appellant's trial counsel proffered testimony from Appellant's brother, David Dwelle, and a friend of fifty-four years, Scott Goertz. After hearing arguments from trial counsel, the trial court inquired as to what evidence existed of sudden passion: "I've got speculation, speculation, speculation; but the evidence I've got, he got mad at her, went and got a hatchet, then went into the house - - it seems somewhat contradictory to a sudden passion [claim]." In response, Appellant's trial counsel stated that "[Appellant] snapped."

## II. *Standard of Review*

Akin to an affirmative defense, the issue of sudden passion must be proved by a preponderance of the evidence. *Matlock v. State*, 392 S.W.3d 662, 667 (Tex. Crim. App. 2013); *see, e.g.*, *McKinney v. State*, 179 S.W.3d 565, 569 (Tex. Crim. App.

2005) (noting that "[s]udden passion is a mitigating circumstance" that can be raised during the punishment phase); *see also Lacy v. State*, No. 11-14-00166-CR, 2016 WL 3382496, at \*4 (Tex. App.—Eastland June 16, 2016, pet. ref'd) (mem. op., not designated for publication). As such, sudden passion may be evaluated for legal *and* factual sufficiency. *Butcher v. State*, 454 S.W.3d 13, 20 (Tex. Crim. App. 2015) (noting that, despite the abolition of factual-sufficiency review as it applies to criminal convictions, "[a]ffirmative defenses may be evaluated for legal and factual sufficiency"); *Matlock*, 392 S.W.3d at 667.

In a legal sufficiency review of an affirmative defense, we examine the record for a scintilla of evidence favorable to the factfinder's finding and disregard all evidence to the contrary unless a reasonable factfinder could not. *Butcher*, 454 S.W.3d at 20 (citing *Matlock*, 392 S.W.3d at 669–70); *see Matlock*, 392 S.W.3d at 667 (explaining that the traditional legal-sufficiency standard set out in *Jackson v. Virginia*, 443 U.S. 307 (1979), is the one "required for criminal cases when the standard of proof is . . . 'beyond a reasonable doubt'"). We may overturn a factfinder's rejection of an affirmative defense for legal insufficiency "only if the appealing party establishes that the evidence conclusively proves his affirmative defense and 'that no reasonable [factfinder] was free to think otherwise.'" *Matlock*, 392 S.W.3d at 670 (quoting *Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009)).

In a factual sufficiency review of an affirmative defense, we examine the entire record in a neutral light. *Butcher*, 454 S.W.3d at 20 (citing *Matlock*, 392 S.W.3d at 671). However, we "may not usurp the function of the [factfinder] by substituting [our own] judgment in place of the [factfinder's] assessment of the weight and credibility of the witnesses' testimony." *Matlock*, 392 S.W.3d at 671 (citing *Meraz v. State*, 785 S.W.2d 146, 154 (Tex. Crim. App. 1990)). Accordingly,

we may sustain a factual-sufficiency challenge only if, after setting out the relevant evidence supporting the verdict and explaining precisely how the contrary evidence greatly outweighs the evidence favorable to the verdict, we clearly state "why the verdict is so much against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased." *Id.*; *accord Butcher*, 454 S.W.3d at 20.

### III. *Analysis*

The offense of murder, if one is convicted, is a first-degree felony. PENAL § 19.02(c). However, at the punishment phase of a trial, a defendant convicted of murder may claim that he caused the death of an individual while under the immediate influence of sudden passion arising from an adequate cause. *Id.* § 19.02(d). If the defendant proves the issue of "sudden passion" in the affirmative by a preponderance of the evidence, the punishment to be considered for the convicted offense is reduced to a second-degree felony range. *Id.*; *McKinney*, 179 S.W.3d at 569.

"Sudden passion" means "passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation." PENAL § 19.02(a)(2). "Adequate cause" means "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." *Id.* § 19.02(a)(1). Thus, to prevail on a sudden passion defense, a defendant must prove by a preponderance of the evidence that: (1) there was an adequate provocation; (2) a passion or an emotion such as fear, terror, anger, rage, or resentment existed; (3) the homicide occurred while the passion still existed and before there was reasonable opportunity for the passion to cool; and (4) there was a causal connection between the provocation, the passion, and the homicide. *McKinney*, 179 S.W.3d at 569.

7

We first consider Appellant's legal sufficiency challenge. In doing so, we must review the evidence supporting the trial court's rejection of Appellant's sudden-passion claim. *See Butcher*, 454 S.W.3d at 20; *Matlock*, 392 S.W.3d at 669–70. Appellant asserts that he conclusively established his claim of sudden passion by a preponderance of the evidence. We disagree.

Appellant expressed that Ford's remarks about sending Rolin back to prison caused him to "snap" and, ultimately, kill Ford. However, Appellant left the room where Ford was seated in a rocking chair, walked to the kitchen, retrieved a hatchet, and then returned to the room where Ford was sitting. Even if we assume that the length of time Appellant took to retrieve the hatchet and then return to the room to butcher and dismember Ford does not show that Appellant acted coolly and deliberately, Ford's remarks alone do not constitute the necessary "adequate cause" that is required to prove sudden passion. *See* PENAL § 19.02(a)(1). Ordinary anger does not rise to the level of adequate cause. *Moncivais v. State*, 425 S.W.3d 403, 407 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd); *see, e.g.*, *McKinney*, 179 S.W.3d at 570 (holding that adequate cause did not exist to support the defendant's claim of sudden passion where the victim yelled at and pushed the defendant); *Gonzales v. State*, No. 11-17-00245-CR, 2019 WL 3727509, at *2 (Tex. App.—Eastland Aug. 8, 2019, pet. ref'd) (mem. op., not designated for publication) (holding that adequate cause did not exist for the defendant's claim of sudden passion where the victim "confronted him in the kitchen, argued with him, pushed him, and grabbed him by the shirt"). Thus, assuming, without deciding, that Appellant actually "snapped" and was acting in a state of reduced self-control due to an intense and overwhelming passion, we are not convinced that Appellant's asserted provocation—that he heard someone's mother consider the possibility of reporting her own daughter to the authorities and exposing her to potential prosecution—is

*adequate* because such provocation, if true, would not cause "a person of ordinary temper" to become "incapable of cool reflection." PENAL § 19.02(a)(1).

We now turn to Appellant's factual sufficiency challenge. In doing so, we review all of the evidence in a neutral light to determine if the contrary evidence greatly outweighs the evidence supporting the trial court's rejection of Appellant's sudden-passion claim. *See Matlock*, 392 S.W.3d at 671. Here, the contrary evidence consisted of Appellant's recorded explanation of the murder, which the trial court evidently rejected as being sufficient to support Appellant's claim of sudden passion. Even considering the testimony from Appellant's brother and Appellant's longtime friend in support of Appellant's claim that he "snapped," we have explained above that Appellant's asserted provocation would not elicit the same reaction in a person of ordinary temperament. Therefore, we conclude that the contrary evidence does not greatly outweigh the evidence supporting the trial court's rejection of Appellant's claim of sudden passion.

Moreover, the trial court clearly expressed concern about the propriety of Appellant's claim of sudden passion. Here, the evidence supporting Appellant's claim of sudden passion was derived primarily from his own statements. As such, the validity of Appellant's defense was inherently a credibility determination for the factfinder to resolve. Because the trial court was the finder of fact, it was free to accept or reject Appellant's defensive theory.

We hold that the evidence is legally and factually sufficient to support the trial court's rejection of Appellant's sudden-passion claim. Accordingly, we overrule Appellant's sole issue on appeal.

## IV. *This Court's Ruling*

We affirm the judgment of the trial court.

W. STACY TROTTER

JUSTICE

July 14, 2022

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.