

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-11-00006-CR

SEAN KRESSE                                                          APPELLANT

V.

THE STATE OF TEXAS                                                      STATE

------------

## FROM THE 16TH DISTRICT COURT OF DENTON COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. Introduction

In three points, Appellant Sean Kresse appeals his punishment assessed after he pleaded guilty to murder. We affirm.

### II. Factual and Procedural Background

In his first trial, Kresse pleaded guilty to murdering his girlfriend, Lorena Sandoval, and the jury assessed fifty years' confinement as his punishment.

---

[1]*See* Tex. R. App. P. 47.4.

*Kresse v. State*, No. 02-09-00271-CR, 2010 WL 1633383, at *1 (Tex. App.—Fort Worth Apr. 22, 2010, no pet.) (mem. op., not designated for publication). We reversed the trial court's judgment and remanded the case for a new punishment trial. *Id.* at *3. A new jury assessed Kresse's punishment at ninety-nine years' confinement, and the trial court entered judgment accordingly. This appeal followed.

### III. Jury Charge

In his first two points, Kresse complains that the trial court erred by failing to charge the jury on sudden passion and by denying his request for an extraneous offense instruction. In our review of a jury charge, we first determine whether error occurred; if error did not occur, our analysis ends. *See Abdnor v. State*, 871 S.W.2d 726, 731–32 (Tex. Crim. App. 1994); *see also Sakil v. State*, 287 S.W.3d 23, 25–26 (Tex. Crim. App. 2009).

### A. Sudden Passion Instruction

In his first point, Kresse argues that the evidence showed that he became distraught when Sandoval

> showed contemptuous behavior toward him, stood over him and verbally abused him and failed to show emotional support after he lost his job. She had also previously threatened to have him killed[] and had friends who sexually molested him. She was communicating to him things concerning how he had caused their relationship to fail[,] designed to upset him.

Based on this evidence, he contends that the trial court erred by refusing to give an instruction on sudden passion. The State responds that Kresse was not

2

entitled to a sudden passion instruction because the events Kresse relied on did not occur on the same day as the murder and because although Sandoval's actions—frowning at Kresse when he arrived home and failing to offer him emotional support—may have provoked Kresse's anger or some other strong emotion, Kresse's emotional reaction was not objectively common in the ordinary, reasonable person.

### 1. Applicable Law

During the punishment stage of trial, a defendant may raise the issue as to whether he caused death under the "immediate influence of sudden passion arising from an adequate cause." Tex. Penal Code Ann. § 19.02(d) (West 2011). "Sudden passion" means "passion directly caused by and arising out of provocation by the individual killed . . . which passion arises at the time of the offense and is not solely the result of former provocation." *Id*. § 19.02(a)(2). "Adequate cause" means "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." *Id.* § 19.02(a)(1).

"An instruction on sudden passion is proper only when the sudden passion was directly caused by and arose out of provocation by the deceased at the time of the offense." *McKinney v. State*, 179 S.W.3d 565, 570 (Tex. Crim. App. 2005). Passion that is solely the result of former provocation does not qualify. *Id*.; *see also Mack v. State*, No. 02-05-00359-CR, 2006 WL 2925122, at *1, *10 (Tex. App.—Fort Worth Oct. 12, 2006, pet. ref'd) (not designated for publication)

3

(holding, after reviewing the evidence that appellant claimed raised the issue of sudden passion, that appellant was not entitled to the instruction when the evidence showed that although live-in girlfriend may have provoked his anger or another strong emotion by yelling at him, arguing with him, being scared of him, and by picking up a knife without threatening him with it, appellant's anger was not "objectively common in the ordinary, reasonable person").

A jury should receive a sudden passion instruction if it is raised by the evidence, even if that evidence is weak, impeached, contradicted, or unbelievable, but the evidence cannot be so weak, contested, or incredible that it could not support such a finding by a rational jury. *McKinney*, 179 S.W.3d at 569 (citing *Trevino v. State*, 100 S.W.3d 232, 238 (Tex. Crim. App. 2003)).

### 2. Evidence

Kresse refers us to the following portion of his testimony in support of his sudden passion argument. On the evening of the murder, Kresse had a beer[2] before learning that he had been fired, then picked up two 24-ounce beers on his way to Nathan Fleming's house, where he drank both beers. At 8:42 p.m., Kresse received a text message from Sandoval asking where he was. He called her back and started walking home. He then gave the following testimony about his thoughts on the way home:

---

[2]Hunter Ballard, Kresse's co-worker, testified that he and Kresse each had three to five beers around 4:30 or 5:00 p.m. that afternoon and that Kresse was still drinking when Ballard left work between 5:45 and 6:15 p.m.

4

Q. What were you—were you thinking about anything on your way home?

A. Yeah, I was.

Q. What?

A. I mean, everything started piling up on me, the weight of how the relationship was going, how—because, you know, like I said, it was my first relationship. It was good, beautiful. I can't ask for anything more out of a relationship. God blessed me.

Like I said, later on, I mean, it got pretty cold.

Q. What do you mean?

A. Just she would—she had a lot of—she had a lot of things that, you know . . . .

Q. What do you mean?

A. I mean, we split apart and got back together a lot. One minute it was—it was—it was great. One day we were happy to see each other. And the next day, she would grab all my stuff or grab whatever she could in the living room and throw it in a pile and say, ["]Get this stuff out of here.["]

You know, the next day it would be fine again. You know, a couple of times she actually, you know, told me she thought about having me killed.

Q. Did you believe her?

A. At first, no, I didn't.

But then one time she said it, and I started laughing, and she said, ["]I'm not joking, I'm not laughing.["]

She would actually—she whispered it a couple of times, when we were laying down, she said, ["]I thought about killing you, I thought about having you killed.["]

Q. How did that make you feel, [Kresse]?

A. Absolutely horrible.

Q. What else?

A. Unfortunately there is a lot else. Early in the relationship, I was actually sleeping in bed one night, I woke up. I wasn't fully awake, I was a pretty heavy sleeper. But somebody was—as I was laying on my stomach, somebody was lifting my arms up, had them behind my back, lifting them above my head, I saw people taking pictures and some guy kissed me on the face.

Q. Do you know who it was?

A. Yeah, it was her friends Pedro and Maggie.

Q. Was she there?

A. Yeah, she was there.

Q. Did you ever try to talk to her about that?

A. Yeah, actually I tried to talk to her about that one and another situation.

Q. What other situation?

A. In October of 2006, I was working two jobs. I was working at Hooligan's and at the haunted house. I mean, I worked from nine a.m. in the morning—I got up at seven and walked to Hooligan's from 35 and Bonnie Brae, and I worked from nine o'clock 'til two in the morning. I mean, I'm trying to get some sleep.

And when I wake up, she had met this gay dude at the haunted house. When I woke up, this gay guy was in my pants.

Q. Did you ever report that to the police, [Kresse]?

A. No, I didn't. It was pretty freaking humiliating.

Q. Do you know who it was?

A. Yeah, I just know the guy's name.

6

Q. His name was what?

A. He had a stage—his name was Randy, but they called him Rain.

Q. So you're thinking about all this as you're walking and you got to the apartment. What happened? Was the door locked or not?

A. Yeah, it was locked.

Q. Was it deadbolted?

A. Yeah, I had the key to the door, but the top deadbolt was locked. I couldn't get the door open.

Q. How did she answer the door?

A. Just like a normal person, she kind of cracked it a little. Once she saw it was me, she frowned and gave me a dirty look, like one of those moods where she really didn't want me to be there. Then all of a sudden she just jumped back and smiled and greeted me.

Q. How did that make you feel, [Kresse]?

A. Like she was pretending to be nice to me, like she really didn't want me to be there.

Q. Then what?

A. Like I was thinking to tell her on the way back, like I was trying to have all my debt settled and help her pay her bills, and everything because I still had hospital bills from the evading resisting charge when I fell and hit my head. And we were talking about getting my own apartment, helping me get on my feet, because it's something we both wanted, it would be easier on us.

I mean, we were talking about—I'm sorry let me get back to what I was saying.

I was thinking about all that stuff and –

. . . .

Q.  What happened after you got there, [Kresse], and after she opened the door?

A.  I walked into the bedroom and sat down on the bed because I had to tell her, you know, that I was drinking, I wasn't supposed to be drinking, I had to apologize to her for that, and I had to tell her I lost another job and things were going to get hard for me.

Q.  Were you crying?

A.  I was.

Q.  How did she respond?  Or did she?

A.  Yes, and she was just kind of used it as an excuse to beat up on me again.

Q.  Do you mean verbally?

A.  Yes.

Q.  And what happened?  What do you remember next?

A.  That I completely lost control.  I jumped up on the bed and I . . . grabbed her by—she was standing in front of me, and I grabbed her by the neck.

Q.  What's the next thing you remember, [Kresse]?

A.  I remember falling to the ground with her on top of me, and then the next time she was limp in my arms.

Kresse said that after he choked her, he was panicked and scared and made several phone calls.

During cross-examination, Kresse admitted that the incident involving Pedro and Maggie taking his photo was in March 2006, around a year and a half

8

before the murder, and the incident involving the "gay dude" occurred in October 2006. He did not remember what Lorena said to him on the night of the murder, stating only that "it wasn't, you know, the emotional support I was needing at that time." He then gave the following testimony:

> Q. And based on your earlier testimony, she did nothing to instigate this, she just didn't give you emotional support; is that correct?
>
> A. Yeah. I just—I lost control. Just the way everything that had been going on, and then giving her every chance to change, and it just didn't seem like it was going to happen. Seemed like I was going to either wake up dead or molested again.
>
> Q. And so you had given her every chance to change, and that wasn't happening?
>
> A. Yeah.
>
> Q. So you choked her?
>
> A. I blew up.

Kresse said that he could not remember how long he choked Sandoval and that he blacked out at that point. He concluded his testimony by stating that he accepted responsibility for what happened and that he did not blame anything on Sandoval.

Kresse argues that the facts set out above are evidence of sudden passion because

> [h]e had acted fairly normally all day prior to arriving him [sic], given the news of his firing. He visited a friend who saw no sign of impending violence. But immediately before he grabbed [Sandoval's] throat, he was in an agitated emotional state because of her verbal abuse and past actions.

9

Under the circumstances presented here, however, we cannot say that Kresse was entitled to an instruction on sudden passion. First, Kresse's testimony reflects that he was concerned with former provocation occurring up to a year before the murder and not on provocation directly caused by Sandoval at the time of the offense. *Cf. McKinney*, 179 S.W.3d at 570 (stating that passion that is solely the result of former provocation does not qualify for the instruction on sudden passion).

Further, Kresse's testimony about Sandoval's actions that night—the "dirty look" she gave him and the verbal abuse that he could not recall but that was not "the emotional support" he wanted after he lost his job several hours (and beers) earlier—would not commonly produce the degree of anger, rage, or resentment in a person of ordinary temper. *See id.* (holding that the victim pushing and yelling at the defendant just before the shooting was not adequate cause to give rise to an immediate influence of sudden passion when the fight began earlier in the day and the defendant had time to deliberate over his actions and prepare his response); *see also Mack*, 2006 WL 2925122, at *1, *10. Rather, Kresse admitted at trial that he had a problem with alcohol, although he said that he had not been aware of it at the time of the murder. He also admitted that alcohol

affected his temper, which additional evidence at trial supported,[3] and that he had been drinking alcohol before the murder.

Other witnesses also testified about Kresse's drinking that day: Ballard, Kresse's co-worker, testified that he and Kresse had a few beers between 4:30 and 5:45 p.m. that day and that when Ballard left work, Kresse was still drinking. Fleming said that Kresse stopped by his house, uninvited, with a couple of beers—described by Kresse as two twenty-four ounce beers —around 6:00 or 7:00 p.m. and stayed until around 9:00 p.m. Fleming said that Kresse became a little drunk and started being "more mouthy" and disagreeable, seeming to be more intoxicated than just a couple of beers would account for. Fleming's wife

---

[3]In addition to testimony about Kresse's drinking on the day of the murder, witnesses testified about two instances in 2006 when Kresse's reactions were outside that of a person of ordinary temper after he had been drinking.

In one instance, Kresse was involved in an incident outside a bar in Denton around 1 a.m. University of North Texas Police Officer Jeff Arrington testified that he ended up pursuing Kresse, that Kresse was very combative, and that he was unable to handcuff Kresse until backup arrived. Kresse admitted that he had been drinking that night.

In the second instance, according to Sandoval's brother, when Kresse went to a concert in El Paso with him and Sandoval, Kresse started a fight on his way to get more beer and was kicked out of the concert. Kresse said that he had only had one beer that night, that it was not his fault that he became involved in a fight, and that he had spit on some people and broken a man's nose that night. Scott Reese, one of Kresse's former work supervisors, testified that Kresse could get "out of control a little bit" when he drank alcohol.

The trial court also admitted and allowed publication of the 911-tape from an April 3, 2007 incident, in which Sandoval reported that Kresse was drunk, that he had been pushing her around and spitting in her face, and that she wanted him to leave.

11

testified that Kresse became confrontational with her while they played darts that night.[4] Kresse explained that Fleming's wife might have taken his behavior as "mouthy," but he said that he was trying for light-hearted humor and "not really trying to attack them at all."

Kresse left the Flemings' house around 8:30 or 9:00 p.m., after he received Sandoval's text message, and started walking home. Between the time that Kresse arrived home and 10:22 p.m., when Reese called him, Kresse choked Sandoval to death.

When Kresse spoke with Reese at 10:22 p.m., he sounded "out of it . . . short of breath, kind of slurring a lot, mumbling." Reese said that Kresse told him that he was "laying here looking at [his] girl's limp, lifeless body." Reese thought Kresse was joking, so he told Kresse to put a mirror under Sandoval's nose to see if she was breathing. Kresse told him to hold on and background noises made him think that Kresse dropped the phone and stumbled around in the house; when Kresse returned, he said, "Now what?" When Reese asked him what was going on, Kresse told him, "Don't pay attention to me, I've been drinking a lot after work," and hung up on him.

Around 11:00 p.m., Kresse called his brother Jack, who said that Kresse sounded like he had been drinking; Jack called their mother, Sheila, who noticed

---

[4]The Flemings both testified that on a previous occasion in August 2007, Kresse had previously come over to their house, started drinking, and become "mouthy," confrontational, and rude.

that she had missed several calls from Kresse. She called Kresse after she spoke with Jack. Kresse told her that there was something wrong with Sandoval, and he sounded hysterical.

At 11:33 p.m., Kresse called Dave Ogozalik, one of his former work supervisors, and asked him if he knew anything about CPR or first aid; Ogozalik told him to hang up and call 911. Sheila arrived at the scene forty-five minutes after she spoke with Kresse on the phone; she found Sandoval on the floor with her head on a mirror. Sheila called 911, checked Sandoval's pulse, and started CPR.

Between 11:30 p.m. and midnight, emergency medical personnel and police were dispatched to Kresse's apartment; a paramedic noted that Kresse used profanity with him when he asked for Sandoval's medical history, telling him, "Mother-F'er, you need to get back to F'ing work." Police officers noted that Kresse's demeanor was abrasive and "all over the place"; they could tell that Kresse was intoxicated and had to restrain Kresse when he tried to go with the ambulance. Kresse resisted their efforts, lunged at one of the officers when he was released, and was arrested for public intoxication.[5] We overrule Kresse's first point.

---

[5]At 12:32 a.m., Sandoval's body arrived at the hospital, and she was pronounced dead at 12:43 a.m.

**B. Extraneous Offense Instruction**

In his second point, Kresse states that the instruction given by the trial court did not fully inform the jurors of how they were required to use extraneous offenses in assessing punishment. The State responds that the trial court properly instructed the jury on extraneous offenses. We agree.

The trial court's instruction to the jury read as follows:

> You are instructed that if there is testimony before you in this case regarding the defendant having committed other acts or participated in other transactions other than the offense alleged against him in the indictment in this case, that you cannot consider such other acts or transactions, if any, unless you first find and believe beyond a reasonable doubt that the defendant committed such acts or participated in such transactions, if any, but if you do not so believe, or if you have a reasonable doubt thereof, you will not consider such testimony for any purpose.

Kresse argues that the trial court should have included his requested addition to the extraneous offense instruction: "In the event that you do believe beyond a reasonable doubt, such evidence may be used solely for the purpose of determining the proper punishment for the offense **to which the Defendant has been found guilty**."

Code of criminal procedure article 37.07, section 3, governs the admissibility of evidence at punishment in all non-capital cases. *Huizar v. State*, 12 S.W.3d 479, 483–84 (Tex. Crim. App. 2000) (op. on reh'g); *see also* Tex. Code Crim. Proc. Ann. art. 37.07, § 3 (West 2006). Further, the court of criminal appeals has recognized in unequivocal terms that extraneous offense evidence may not be considered by the jury in assessing punishment "until the fact-finder

14

is satisfied beyond a reasonable doubt that [such acts and offenses] are attributable to the defendant. . . . *Once this requirement is met*, the fact-finder may use the evidence however it chooses in assessing punishment." *Huizar*, 12 S.W.3d at 484 (quoting *Fields v. State*, 1 S.W.3d 687, 688 (Tex. Crim. App. 1999)). As set out above, Kresse received an instruction from the trial court meeting this description.

Nonetheless, Kresse argues that the instruction could leave no doubt that the jury could not "simply tack on extra time based on the extraneous offenses." He relies on *Lomas v. State*, 707 S.W.2d 566 (Tex. Crim. App. 1986), and *Klueppel v. State*, 505 S.W.2d 572 (Tex. Crim. App. 1974), to support his argument. However, *Lomas* and *Klueppel* are inapposite because in both cases, the appellant argued, and the court of criminal appeals held, that the State made improper closing arguments by inviting the jury to sentence the appellant for offenses collateral to the charged offense. *See Lomas*, 707 S.W.2d at 567, 570; *Klueppel*, 505 S.W.2d at 574–75. Kresse does not complain about the State's closing argument.

Furthermore, as pointed out by the State, *Lomas* and *Klueppel* were decided before the legislature's 1993 amendment of code of criminal procedure article 37.07, section 3(a), to allow for the introduction of evidence of unadjudicated extraneous offenses during the punishment phase of trial. *See Arthur v. State*, 11 S.W.3d 386, 391–92 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd) (explaining that under the new version of article 37.07, section 3(a),

once the trial judge has made a threshold determination that the extraneous offense evidence is relevant and the factfinder is satisfied beyond a reasonable doubt that the prior acts are attributable to the defendant, "the fact-finder may use the evidence however it chooses in assessing punishment"). The jury is allowed to consider these extraneous offenses to allow it to "learn 'as much useful information as possible in deciding the appropriate punishment for the individual defendant.'" *Id.* at 392 (citing *Mendiola v. State*, 924 S.W.2d 157, 163 (Tex. App.—Corpus Christi 1995, pet. ref'd, untimely filed)). Kresse has cited us to no authority requiring more than the instruction given by the trial court under section 37.07, section 3(a);[6] instead, he merely speculates that the jury improperly increased his sentence based on the extraneous offenses. We overrule his second point.

## IV. Confrontation

In his third point, Kresse argues that the trial court erred by admitting into evidence the tape of Sandoval's April 3, 2007 911 call, complaining that there was no authentication of the person on the 911 tape as Sandoval and that it was

---

[6]Article 37.07, section 3(b) provides that if the jury has the responsibility of assessing punishment, "the court shall give such additional written instructions *as may be necessary and the order of procedure and rules governing the conduct of the trial shall be the same as are applicable on the issue of guilt or innocence*." Tex. Code Crim. Proc. Ann. art. 37.07, § 3(b) (emphasis added). However, Kresse has not shown that an instruction beyond what the trial court gave the jury was necessary under the circumstances presented here.

therefore inadmissible hearsay. However, as pointed out by the State, Kresse never raised authentication at trial.

Kresse objected "under 6th Amendment to the United States Constitution, the 14th Amendment to the United States Constitution, Article 1, Section 10 of the Texas Constitution, and hearsay found in the Texas Rules of Evidence." The State replied,

> [B]ased on those objections, we would just argue that in Crawford and Davis, a 9-1-1 is considered nontestimonial, which overcomes the 6th Amendment and the other objections. If it's related to an ongoing emergency, the hearsay objections can be overcame [sic] by excited utterances made by the individual on the other end of the line and present-sense impressions of the things that that person is seeing when they are relaying that information to the 9-1-1 operator.

Kresse then clarified, "Judge, I would just say that based on the content of the 9-1-1 call, it's clear that there's not such an ongoing emergency at that time, and I would argue that it is testimonial and falls outside of those exceptions he just stated to you." The trial court overruled the objections and admitted State's Exhibit 104, the 9-1-1 call recording. Because Kresse did not raise the authentication argument in the trial court, he has not preserved it for our review.[7] *See* Tex. R. App. P. 33.1(a); *Lovill v. State*, 319 S.W.3d 687, 691–92 ("A complaint will not be preserved if the legal basis of the complaint raised on appeal varies from the complaint made at trial."). We overrule Kresse's third point.

---

[7]Further, during his cross-examination of 911 dispatcher Michelle Pruett, Kresse referred to Sandoval as the caller.

## V.  Conclusion

Having overruled all of Kresse's points, we affirm the trial court's judgment.


PER CURIAM

PANEL:  MCCOY, J.; LIVINGSTON, C.J.; and DAUPHINOT, J.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  February 23, 2012