

## NUMBER 13-22-00495-CR

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI – EDINBURG

GREG BOHAC A/K/A
GREG ALLEN BOHAC,                                                    Appellant,

v.

THE STATE OF TEXAS,                                                   Appellee.

### On appeal from the 156th District Court
### of Bee County, Texas.

## MEMORANDUM OPINION

### Before Justices Tijerina, Silva, and Peña
### Memorandum Opinion by Justice Tijerina

A jury convicted appellant Greg Bohac a/k/a Greg Allen Bohac of murder and

assessed punishment at twenty years' imprisonment. *See* TEX. PENAL CODE ANN. § 19.02.

By two issues, appellant argues the State failed to prove that he "intended to kill the victim"

and that the evidence is insufficient to support the jury's finding that he "was not acting under sudden passion when he caused the victim's death." We affirm.

## I.    BACKGROUND

Appellant was charged with murdering Austin Salinas. A jury trial commenced on September 22, 2022. At the hearing, it was established that on July 31, 2018, appellant was having a BBQ at his residence. Regan Jaso, Logan Harvey, Caleb Abel, Cameron Lerma, and Quinton Alsobrook were in attendance.[1]

### A.    Eryne Garcia's Testimony

Eryne Garcia testified that he was with his best friend Austin on July 31, 2018, when they received a message from Regan asking for marijuana and cocaine. Eryne and Austin communicated to Regan via Snapchat they would sell him marijuana for $300; however, Eryne and Austin "made up [their] mind[s]" they would "just take the money" from Regan because Regan was with Logan, and Austin and Logan had gotten into a fight a few days prior to the drug deal.

They proceeded to appellant's residence in Austin's white Challenger. When they arrived, Caleb and Regan approached the Challenger and handed Eryne $300 through the passenger window. Eryne stated someone said, "[H]ey Logan, is that the dude that you had [] a fight [with?]" Eryne immediately drove away after hearing that in accordance with their plan.

---

[1] We refer to the individuals by their first name for ease of reference. Regan and Quinton were minors when these events unfolded. Austin was nineteen years old.

2

Austin told Eryne that he had a "bad feeling" about the events that had just unfolded and wanted to return the money, but Eryne "shut it down" because "it already happened[, and] it would just be more problems" if the money were to be returned. The two parted ways, and Austin made his way back to his house.

Eryne did not hear from Austin until around 3:00 a.m. when Austin called Eryne screaming, "Logan and them got me." According to Eryne, he heard Austin, "choking on his blood." When Eryne arrived at Austin's house, the police were already at the scene.

## B. Regan's Testimony

Regan testified that he was with Caleb, Quinton, Logan, Cameron, and appellant at appellant's residence. Regan remembers Logan wanting cocaine and appellant wanting marijuana. Caleb informed the party that he had a connection to obtain the drugs. According to Regan, Logan and appellant gave Caleb money for the cocaine and marijuana.

Once Austin and Eryne arrived at appellant's residence, Regan and Caleb approached Austin's Challenger. Regan stood back like five yards while Caleb stood by the lowered window of the Challenger and conversed with Eryne. The Challenger then fled the scene. According to Regan, Caleb turned around and stated, "[T]hey took my money" while Caleb ran back to appellant's residence and announced the theft.

The next thing Regan remembers is appellant retrieving firearms from his home, "I remember two pistols and one like crazy gun like some machine gun type." Regan, Caleb, Quinton, Logan, Cameron, and appellant entered appellant's truck. They drove around

3

for a couple of hours—even appearing at Austin's grandmother's house first only to find out that was not Austin's residence. Next, they met up with other individuals at a Whataburger—in an attempt to get directions to and locate Eryne and Austin.

Once they arrived at Austin's house after 1:00 a.m., everyone exited appellant's truck. He remembered appellant brandished "that crazy looking" gun, Cameron also had a firearm, and Regan could not remember if Quinton or Logan had the third gun. Regan stated that they all approached the Challenger because they remembered it being Austin's vehicle, and he "just hear[d] a bunch of air" coming out of the Challenger's tires. Regan then saw Austin open the front door and state, "[W]hat the fuck." Regan testified that "[appellant] was right in front of" Austin, and then "[appellant] shot Austin."

Regan stated they all scrambled inside appellant's truck. Appellant drove off without turning on the truck's headlights. Cameron then asked appellant, "[D]id you hit him," and appellant responded, "yes." Regan testified that some of the occupants in the vehicle suggested throwing the guns out of the window, stating, "throw them out, throw them out" immediately before they were pulled over by police.

## C. Quinton's Testimony

Quinton testified that he was also indicted for murder. As part of a plea agreement with the State and his testimony in appellant's case, he would be placed on deferred adjudication for manslaughter. *See id.* § 19.04.

Quinton testified that he was a back passenger in appellant's truck on the night of Austin's death. When they arrived at Austin's house, appellant instructed them to exit the

4

vehicle. Quinton testified that Cameron asked him for his pocketknife because Cameron wanted to slash Austin's tires, but Quinton informed Cameron that his "knife wasn't going to slice that tire" because "it was dull and rusty." Quinton stated, "He then grabs the knife out of my hand," and "let's [sic] air out of the tire through the valve with my knife."

Quinton remembered appellant walked up to the front door, and Austin then stepped out. Quinton testified that Austin took a few steps forward, Austin asked what they were doing there, and no one responded. He then observed appellant pull "a gun from his waistline and starts shooting at Austin." He stated the porch light was on, so he was able to see the encounter and appellant's face. According to Quinton, appellant fired "five to seven shots . . . in a row."

Quinton stated that Austin held "his chest, torso area" and stumbled back. Immediately, everyone ran toward the truck. As appellant drove the truck to flee the scene, Quinton witnessed appellant and Cameron throw two guns out of the window before they were apprehended by police. Quinton started asking, "[W]hat the F just happened."

B.    **Appellant's Testimony**

Appellant testified that Regan, Caleb, Quinton, and Logan were conversing at his residence when appellant agreed to purchase marijuana and put "a little over $100" "into the pot" to get "[a] quarter ounce of hydroponic." He left the vicinity to take a shower to get ready to head out and make the transaction. When he returned, he overheard Caleb say something about "stealing his money or taking his money." Appellant then gathered

his keys, wallet, "just out of safety . . . a couple of guns," and "a handful of bullets" before they all walked out and entered his company truck. According to appellant, the two guns, a Tec 9 and 357 Revolver, were brandished on the center console of the truck. While in route to Beeville, Cameron opened the glove box and pulled out a Ruger 9mm from the glove compartment.

Appellant stated they drove to a car wash then an apartment complex before finally arriving at Austin's house. When they arrived at Austin's house, appellant stated he "parked a little ways away" instead of parking in front of the house because he "was kind of skeptical," "nervous," and "scared about the situation." As everyone exited the vehicle, appellant "grabbed the guns . . . for safety . . . fearing something would happen." Appellant stated he heard very loud music, so he went to the back of Austin's fence to determine whether there was a party. Once he realized there was no party, he started walking back to the truck when he suddenly heard, "[Y]ou don't know who you're fucking with," which caught him off guard. Appellant claimed he "spun around" and noticed Austin point a gun at him. According to appellant, while he was on the neighbor's property, Austin "shoots a shot," causing appellant to return fire. All he "remember[ed] is just the muzzle of his gun going off and just fearing danger and just squeezing, squeezing, squeezing as fast as [he] could and just squeezing, squeezing, squeezing, squeezing." Appellant explained that he feared for his life. He did not intend to kill anybody, he "just squeezed as fast as [he] could until [he] felt no more danger."

6

Appellant ran to the truck, drove off, and threw one gun out the window along with a marijuana joint while Cameron threw out the other gun. An officer approached them with lights and sirens. Appellant stated that while he was being detained, it was "the first time [he] was aware that somebody had been injured."

The jury convicted appellant of murder and sentenced him to twenty years' imprisonment. This appeal followed.

## II. INTENT

By his first issue, appellant argues that the evidence is legally insufficient to show that he intended to kill Austin. Specifically, appellant argues "the evidence only gives rise to an inference that he acted recklessly in defending himself from deadly force with his firearm."

### A. Standard of Review & Applicable Law

We review the legal sufficiency of the evidence by considering all the evidence in the light most favorable to the jury's verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979); *Nowlin v. State*, 473 S.W.3d 312, 317 (Tex. Crim. App. 2015). We give deference to the responsibility of the factfinder to fairly resolve conflicts in testimony, weigh evidence, and draw reasonable inferences from the facts. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). We defer to the factfinder's determinations on witnesses' credibility and the weight to be given to their testimony and do not substitute our judgment on these matters. *Brooks v. State*, 323

7

S.W.3d 893, 899 (Tex. Crim. App. 2010). As charged in this case, a person commits murder if he (1) intentionally or knowingly causes the death of an individual or (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. TEX. PENAL CODE ANN. § 19.02(b)(1), (2).

"[T]he specific intent to kill may be inferred from the use of a deadly weapon." *Cavazos v. State*, 382 S.W.3d 377, 384 (Tex. Crim. App. 2012). "Naturally, the most obvious cases, and the easiest ones in which to prove a specific intent to kill, are those cases in which a firearm was used and was fired or attempted to have been fired at a person." *Godsey v. State*, 719 S.W.2d 578, 581 (Tex. Crim. App. 1986) (en banc).

**B.    Discussion**

Here, Regan, Quinton, and appellant, testified that appellant gathered firearms *and* ammunition in preparation for his impending encounter with Austin after learning that he and his friends were hoodwinked out of $300. Quinton and Regan testified that they spent a considerable amount of time searching for Austin. When they finally arrived at Austin's home, they witnessed Austin open the door, the porch light turned on, and appellant was standing directly in front of Austin when appellant fired multiple rounds at Austin. *See Cavazos*, 382 S.W.3d at 384. Appellant testified that he remembered shooting Austin and "squeezing, squeezing, squeezing as fast as [he] could." *See Godsey*, 719 S.W.2d at 581. There was testimony that Cameron asked appellant, "[D]id you hit him," and appellant responded, "[Y]es." Thus, because appellant used a firearm, the jury could have inferred that he intended to cause Austin's death. *See id.* ("If a deadly weapon is used in [a] deadly

8

manner, the inference is almost conclusive that he intended to kill."); *see also Bush v. State*, No. 13-17-00390-CR, 2018 WL 3675931, at *3 (Tex. App.—Corpus Christi–Edinburg Aug. 2, 2018, pet. ref'd) (mem. op., not designated for publication) ("The specific intent to kill may be inferred from the use of a deadly weapon, unless in the manner of its use it is reasonably apparent that death or serious bodily injury could not result."). Accordingly, we conclude there was legally sufficient evidence for the jury to conclude that appellant intended to cause Austin's death. We overrule his first issue.

### III.  SUDDEN PASSION

By his second issue, appellant argues that the "evidence is legally insufficient to support the jury's determination that [a]ppellant was not acting under sudden passion when he caused the victim's death."

### A.  Applicable Law

"Sudden passion is a mitigating circumstance that is relevant to determining the appropriate punishment of a defendant." *Beltran v. State*, 472 S.W.3d 283, 293 (Tex. Crim. App. 2015). A defendant may reduce a murder charge from a first-degree felony to a second-degree felony by proving by a preponderance of the evidence that the defendant "caused the death under the immediate influence of sudden passion arising from an adequate cause." TEX. PENAL CODE ANN. § 19.02(d); *see also Hernandez v. State*, 127 S.W.3d 206, 211–12 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd). "'Sudden passion' means passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the

9

offense and is not solely the result of former provocation." TEX. PENAL CODE ANN. § 19.02(a)(2). "'Adequate cause' means cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." *Id.* § 19.02(a)(1); *cf. Moncivais v. State*, 425 S.W.3d 403, 407 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (finding that ordinary anger or fear alone does not raise an issue of sudden passion arising from adequate cause).

"A defendant may not rely on a cause of his own making, such as precipitating a confrontation, to support his argument that he acted out of sudden passion arising from adequate cause." *Smith v. State*, 355 S.W.3d 138, 149 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). "Anticipation of an event and preparation of a response indicates a defendant had time to deliberate over an action and did not act under the immediate influence of sudden passion." *Moncivais*, 425 S.W.3d at 407.

## B. Standard of Review

For matters in which the defendant bears the burden of proof by a preponderance of the evidence—such as a sudden-passion claim—we employ the civil standards of review for legal and factual sufficiency of the evidence. *See Matlock v. State*, 392 S.W.3d 662, 671 (Tex. Crim. App. 2013) (recognizing that a factual-sufficiency review applies to issues where the burden of proof is by a preponderance of the evidence because that standard is the same used in various civil proceedings); *Rankin v. State*, 617 S.W.3d 169, 184–85 (Tex. App.—Houston [1st Dist.] 2020, pet. ref'd). As applied to a sudden-passion claim, we review the evidence for legal sufficiency by examining the record for any

10

evidence that supports the jury's finding while ignoring all evidence to the contrary unless a factfinder could not. *Matlock*, 392 S.W.3d at 669; *Rankin*, 617 S.W.3d at 185. If no evidence supports the jury's finding, we review the entire record to determine whether the evidence establishes the opposite as a matter of law. *Matlock*, 392 S.W.3d at 668; *Rankin*, 617 S.W.3d at 185.

We review the evidence for factual sufficiency to support the jury's finding by examining all of the evidence in a neutral light to determine whether the verdict is "so against the great weight and preponderance of that evidence as to be manifestly unjust." *Matlock*, 392 S.W.3d at 672–73 (citation omitted); *Rankin*, 617 S.W.3d at 185–86. We may only sustain a factual-sufficiency challenge "if, after setting out the relevant evidence and explaining precisely how the contrary evidence greatly outweighs the evidence supporting the verdict, the court clearly states why the verdict is so much against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased." *Matlock*, 392 S.W.3d at 671. "We may not, however, intrude on the fact[]finder's role as the sole judge of the weight and credibility of the witnesses' testimony." *Moncivais*, 425 S.W.3d at 409.

## C.     Discussion

Here, the jury could have concluded that appellant precipitated the confrontation that led to Austin's death. Appellant testified that he grabbed firearms and ammunition prior to leaving his home in an effort to retrieve the cash that was stolen from the group. *See McKinney v. State*, 179 S.W.3d 565, 570 (Tex. Crim. App. 2005) ("[I]t appears that

Appellant had time to consider how to deal with his son, and by retrieving his gun, he was preparing himself to respond to the altercation he was anticipating."). Thus, appellant testified that he anticipated that an encounter with Austin prefaced the need for a firearm even though he was "hoping nothing bad would happen." *See Moncivais*, 425 S.W.3d at 407.

Appellant drove for several hours searching for Austin's home. When appellant finally arrived at Austin's house, appellant parked a "ways" away and then armed himself with the "crazy looking" firearm prior to exiting his vehicle. *See id.* at 408 ("Anticipation of and preparation for the fight constitutes some evidence that Moncivais had time to deliberate regarding his actions."); *see also Ontiveros v. State*, No. 04-09-00590-CR, 2010 WL 4488611, at *3 (Tex. App.—San Antonio Nov. 10, 2010, pet. dism'd) (mem. op., not designated for publication) (holding evidence that a defendant went to retrieve his gun before discovering that his tires were slashed demonstrated anticipation and preparation even before he was provoked and was not sufficient to require sudden passion instruction). The State admitted Austin's neighbor's surveillance video into evidence, and in the video, appellant is seen surreptitiously and cautiously walking across the neighbor's yard while pointing a firearm directly in front of him.

Regan and Quinton testified that appellant approached Austin's door. *See Moncivais*, 425 S.W.3d at 407 (providing that "a defendant may not rely on a cause of his own making to support an argument for sudden passion"). In the video, Austin's porch light is turned on. Regan and Quinton also testified that Austin opened the door and

12

appellant stood directly in front of Austin and fired at him. Thus, some evidence exists that appellant precipitated the confrontation that led to Austin's death. *See Smith*, 355 S.W.3d at 149.

In examining the record under the first prong of the civil legal sufficiency standard, we conclude that some evidence supports the jury's negative finding on sudden passion. *See Matlock*, 392 S.W.3d at 671. "Thus, we need not address the second prong of the civil legal sufficiency standard—whether [appellant] proved sudden passion—because that prong only applies if no evidence supports the jury's finding." *Rankin*, 617 S.W.3d at 169.

Regarding factual sufficiency, appellant largely relies on his own testimony to argue that the jury's finding of no sudden passion was against the great weight and preponderance of the evidence. Specifically, appellant testified that he "feared for his life" and kept pulling the trigger because he felt like he was in "danger." However, the jury was free to doubt this testimony as a matter of witness credibility. *See Moncivais*, 425 S.W.3d at 408. Moreover, the jury heard testimony from multiple witnesses, including appellant, that appellant prepared for his encounter with Austin by retrieving firearms and ammunition, and drove several hours in attempt to locate Austin in an effort to obtain appellant's $300. As the sole judge of the weight and credibility of a witness's testimony, the jury had a right to believe this testimony. *See id.* "To hold otherwise is to substitute our judgment for that of the jury. Instead, without a contradictory showing from the record, we defer to the jury's determinations about the weight and credibility of the evidence."

*Rankin*, 617 S.W.3d at 187; *see also Johnson v. State*, 23 S.W.3d 1, 8 (Tex. Crim. App. 2000) (en banc). "Viewing all of the evidence in a neutral light, we cannot say that the jury's finding of no sudden passion is so weak as to be manifestly unjust or against the great weight and preponderance of the evidence." *Rankin*, 617 S.W.3d at 187. We overrule appellant's second issue.

## IV. CONCLUSION

We affirm the judgment of the trial court.

JAIME TIJERINA
Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed on the
10th day of August, 2023.

14